**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

JIM TROTTER,                                 :

                                :     Civil Action No.:

                 Plaintiff,        :

                                :

             v.        :     **COMPLAINT**

                                :

THE NATIONAL FOOTBALL LEAGUE; NFL            :
ENTERPRISES LLC; and NFL NETWORK             :
SERVICES, INC.,                              :     **Jury Trial Demanded**

                                :

                 Defendants.     :

------------------------------------------------------------ X

> "When I think of the Hall of Fame, I think of impact, I think of difference makers, and I think of legacy.  And many of you with gold jackets who I've talked to have told me that your goal was to leave the game in better shape than you found it.  And those words have stayed with me over the years, so much so that I have even tried to apply them to my profession.  I've thought about—how can I open the door for those who come behind me?  How can I make newsrooms more reflective of the communities that they cover?"

> ▪ Jim Trotter, August 5, 2023, acceptance speech for the Bill Nunn, Jr. Award from the Pro Football Hall of Fame, given to one journalist per year for long and distinguished contribution.

## PRELIMINARY STATEMENT

1.     Plaintiff Jim Trotter, a renowned and award-winning football journalist with impeccable credentials and a reputation beyond reproach, was let go by the National Football League ("NFL") because he challenged Commissioner Roger Goodell and others regarding the NFL's record of race discrimination and lack of diversity.  During his tenure, Mr. Trotter repeatedly called out the NFL for refusing to address long-standing, systemic and institutional discrimination within coaching ranks, within the NFL league office and within the NFL Media newsroom.  For having the integrity and courage to stand up to the NFL, Mr. Trotter lost his job.

2.      The timeline of Mr. Trotter's termination is as follows:

• After having worked for the NFL for five years, on November 16, 2022, Sandra Nunez (NFL Vice President of On-Air Talent Management), told Mr. Trotter's agent that she "**could not envision any reason why his [Mr. Trotter's] contract would not be renewed**" at the end of March 2023.  In the same conversation, Ms. Nunez even asked his agent whether Mr. Trotter wanted to expand his role in any way.

• Less than two months later, on February 8, 2023, Mr. Trotter publicly challenged the NFL and Mr. Goodell during a "State of the League" press conference for the NFL's deplorable record on hiring, retaining and advancing Black leaders across the organization including in the NFL newsroom, stating in part, "**You and other league officials have said that the league's commitment to diversity, equity and inclusion, extends beyond the sidelines and beyond the front offices, and is applied to all aspects of the company.  I've worked at NFL media for five years, and during those five years we've never had a black person in senior management in our newsroom.  That's a problem…**"[1] repeating a similar remark from the previous year.

• The next day, on February 9, 2023, Mr. Trotter's direct supervisor, Ali Bhanpuri (NFL Media, Senior Director, Content & Editorial) asked one of Mr. Trotter's colleagues, "**Why does Jim keep bringing this up?**"

• Three weeks later, on March 1, 2023, Ms. Nunez—after having had no further substantive communication with Mr. Trotter or his agent since confirming his contract would be renewed—asked Mr. Trotter if he was "**in alignment**" with the NFL.  Mr. Trotter responded that he was "**not in alignment with a newsroom that does not have Black representation in decision-making positions**" and recounted examples of discriminatory conduct he endured while working for the NFL.

• In a series of emails from March 12 through 16, 2023, Mr. Trotter reported to Ms. Nunez that he was not being given assignments and was being retaliated against for having challenged Mr. Goodell about the unacceptable lack of diversity in the NFL Media newsroom and on the news desk.

• Eight days later, on March 24, 2023, Ms. Nunez told Mr. Trotter's agent that his contract would not be renewed.

---

[1]      See https://twitter.com/JimTrotter_NFL/status/1623418098429591554 (emphasis added).

3.      It has already been acknowledged by many in the media,[2] that the NFL retaliated against and took vengeance on Mr. Trotter for him having taken the NFL to task on its discriminatory practices.  The NFL's treatment of Mr. Trotter is consistent with a documented history of silencing, retaliating against and "blackballing" Black men who speak out about such conduct.  This is the NFL's *modus operandi* and part of the fabric of the league.

4.      But Mr. Trotter's experience with discrimination and retaliation was not limited to his termination.  Throughout his employment, Mr. Trotter witnessed and observed discriminatory and/or hostile conduct by his employers—including by NFL team owners—that went entirely unchecked as a matter of standard operating procedure.

5.      As one such example, Terry Pegula, owner of the Buffalo Bills, stated in reference to player protests against racial injustice that, "**If the Black players don't like it here, they should go back to Africa and see how bad it is.**"  See infra at §III(D).  Mr. Trotter raised complaints and concerns about this remark but no remedial action was taken.

6.      As another example, Jerry Jones, owner of the Dallas Cowboys, responded to a question posed by Mr. Trotter regarding the dearth of Black professionals in decision making positions for NFL teams by stating, "**If Blacks feel some kind of way, they should buy their own team and hire who they want to hire.**"  See infra at §III(C).  Mr. Trotter raised complaints and concerns about this remark but no remedial action was taken.

7.      Mr. Trotter raised his concerns on numerous occasions about the NFL's record on racial diversity and discrimination, but the NFL did nothing to legitimately investigate or address

---

[2]      See e.g. *Jim Trotter's non-renewal with NFL Media raises concerns among journalists*, Sports Business Journal, (March 29, 2023), https://www.sportsbusinessjournal.com/Daily/Issues/2023/03/29/Media/nfl-media-jim-trotter.aspx; Mosley, Kyle, *Jim Trotter's Exit is a Cautionary Tale for Media Professionals*, SI.com, (March 28, 2023), https://www.si.com/college/hbcu/nfl/jim-trotters-exit-cautionary-tale-media; *NFL Network opts not to renew contract of Jim Trotter, who had twice confronted the Commissioner on diversity*, NBC Sports, Pro Football Talk, (March 27, 2023), https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/nfl-network-opts-not-to-renew-contract-of-jim-trotter-who-had-twice-confronted-the-commission-on-diversity.

his concerns—even though offensive conduct was being committed by people at the very top of the NFL hierarchy.

8.      Mr. Trotter's experience is part of a long list of cautionary tales involving the treatment of Black professionals across the NFL.  The NFL has a history that is synonymous with discrimination, lack of racial inclusion and retaliation at all levels and aspects of the organization and continues to the present despite persistent calls for diversity:

- Out of 32 teams, there are no Black majority owners and never has been.

- There are only 8 Black General Managers.

- There are only 3 head coaches who identify as Black.

- Within the NFL league office, there has never been a Black Commissioner.

- Currently, at the Executive Vice President-level and above within the NFL, only two out of 12 employees are Black.

- In the NFL Media newsroom, there are no Black managers, no Black copy editors and no Black full-time employees on the news desk.

9.      All of these numbers stand in stark contrast to a league in which 60-70% of the players are Black.  Clearly the NFL's lack of diverse leadership led to a league and organization where Black people are not being given equal opportunities to obtain and/or advance to positions of meaningful authority.  And if a Black person chooses to speak up and oppose discrimination, it all too often leads to retaliation.

10.     The NFL has consistently acquiesced to and participated in outright discrimination and continues to refuse to take remedial action to solve this obvious problem.  Mr. Trotter is only the latest victim—but without change, will not be the last—of the NFL's steadfast commitment to silence and seeking vengeance against those who seek change.

## CLAIMS AND RELIEF

11.     Mr. Trotter files this action seeking all available remedies under the law for

Defendants' unlawful conduct in violation of Section 1981 of the Civil Rights Act of 1866

("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.*

("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et*

*seq.* ("NYCHRL").

12.     In particular, Mr. Trotter seeks equitable relief to force the NFL to remedy and

change its discriminatory and retaliatory practices and comply with the law.  Specifically, Mr.

Trotter seeks the imposition of a court-ordered monitor to review the NFL's policies and/or

practices and implement necessary changes with respect to the hiring, retention and advancement

of Black people throughout all levels of the NFL organization and hierarchy, including in the

NFL Media newsroom, the NFL league office and within NFL teams.  Mr. Trotter also seeks a

full-scale investigation into the discriminatory and/or retaliatory animus of all persons in position

of power within the NFL, including the NFL team owners.  The NFL and team owners have

repeatedly shown they are unable to monitor and police themselves, making these equitable

measures a necessary component of any awarded relief.

## ADMINISTRATIVE PROCEDURES

13.     Plaintiff will file a Charge of Discrimination with the Equal Employment

Opportunity Commission ("EEOC") and the California Civil Rights Department ("CRD"),

administrative pre-requisites to filing an action under Title VII of the Civil Rights Act of 1964

("Title VII") and the California Fair Employment & Housing Act ("FEHA").

14.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon

the New York City Commission on Human Rights and the New York City Law Department,

Office of the Corporation Counsel within 10 days of its filing, thereby satisfying the notice requirements of this action.

15.     Plaintiff has complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under § 1981.  The Court has supplemental jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in within this district and because the parties contractually agreed to this Court's jurisdiction.

## PARTIES

18.     Plaintiff Jim Trotter is a Black man and resident of California.  Mr. Trotter worked for Defendants from 2018 through March 31, 2023.

19.     Defendant the National Football League is a trade association doing business in the State of New York made up of 32 professional football teams and with a principal place of business located at 345 Park Avenue, New York, NY 10154.  The NFL wholly owns and operates Defendant NFL Enterprises LLC, Defendant NFL Network, Inc. and/or all related NFL media platforms, including but not limited to The NFL Network, NFL.com and NFL NOW.  At all relevant times, the NFL was Plaintiff's employer.

20.     Defendant NFL Enterprises LLC ("NFL Enterprises") is a corporation doing business in the State of New York with a principal place of business located at 345 Park Avenue, New York, NY 10154.  NFL Enterprises is a single and/or joint employer with the NFL.  At all relevant times, NFL Enterprises together with the NFL was Plaintiff's employer.

21.     Defendant NFL Network Services, Inc. ("NFL Network") is a corporation doing business in the State of New York with a principal place of business located at 345 Park Avenue, New York, NY 10154.  NFL Network is a single and/or joint employer with the NFL.  At all relevant times, NFL Network together with the NFL was Plaintiff's employer.

22.     During Mr. Trotter's employment with the NFL, he executed two employment contracts, one of which listed his employer as NFL Network and the other as NFL Enterprises. However, Mr. Trotter's reporting structure, location and all material aspects relating to the terms and conditions of his employment remained the same.  In the respective contracts, NFL Enterprises and NFL Network were defined to include all NFL media platforms.  For all purposes herein, NFL Enterprises and NFL Network are together referred to as "NFL Media."

## FACTUAL ALLEGATIONS

## I.     THE NFL'S HISTORY OF SYSTEMIC RACE DISCRIMINATION

### A.     The NFL's Failure to Address its Lack of Racial Integration

23.     As has been widely reported, the NFL has a long history of race discrimination which has been emphasized by a steadfast refusal to take necessary and appropriate remedial actions.  Unfortunately, the NFL to this day remains mired in a culture that lacks inclusivity and where barriers to entry for Black professionals exist throughout the NFL's organizational structure—from the top down, including team owners, team leadership and coaching positions, NFL executives, and NFL employees.

24.     By way of brief background, the NFL was formed in 1920.  Although a minimal level of racial integration started in the 1920s, it quickly disappeared.  In 1930s, a "gentleman's agreement" led to a discriminatory ban on black players for almost 15 years—widely accepted as one of the most despicable moments in sports history.  The Washington Football Team's owner

George Preston Marshall, together with other founding owners appear to have colluded and cooperated in this widespread racial ban.[3]

25.    It was not until 1946 that Black players re-entered professional football.  Still, by 1959, only 12% of the league's players were Black.  The NFL only engaged in genuine full-scale racial integration when it became economically necessary due demands from media and the public, the emergence of the rival and more racially progressive leagues (such as the American Football League) and the success of numerous minority athletes in college football.

26.    Ultimately, the NFL has profited immensely from racial integration, becoming the dominant sports league in the country.  However, since re-integration the NFL was slow to truly embrace racial diversity as it took (i) approximately *20 years* for the League to hire its first Black official (Burl Toler), (ii) until at least the 1980s—approximately *40 years* after integration—for teams to genuinely accept Black players at the quarterback position (*i.e.*, Warren Moon and Randall Cunningham);  (iii) *43 years* for the first Black Head Coach to be hired (Art Shell), and (iv) *54 years* for an NFL team to hire a Black General Manager (Ozzie Newsome).

27.    This failure to integrate was a function of team owners and executives who make hiring and personnel determinations.  The NFL, which is an organization controlled by those same owners, engaged in virtually no efforts during these decades to address the systemic discrimination and lack of embracement of integration.

28.    For a league and its team owners who have profited immensely off Black players, the NFL has never fully acknowledged its history of racism or taken appropriate steps to address

---

[3]    See Moore, Louis, *The NFL and a History of Black Protest*, AFRICAN AMERICAN INTELLECTUAL HISTORY SOCIETY, (Sept. 12, 2018) (citing *Kenny to get Tryout with National League*, LOS ANGELES TRIBUNE, (Jan. 19, 1946)), https://www.aaihs.org/the-nfl-and-a-history-of-black-protest/#fn-42670-3.

its racial disparities.  While there are countless examples of the NFL's problems with race discrimination that continue to the present, below are merely a few examples.

**B.      Discrimination Against and "Blackballing" of Colin Kaepernick**

29.      During the 2016-17 NFL season, Colin Kaepernick protested societal racial injustice by kneeling during the national anthem.  Following that season, in which Kaepernick held a passer-rating of 90.7 besting 13 other starting quarterbacks, no NFL team would offer him a job even as a backup, of which teams typically have at least two.

30.      Mr. Kaepernick was "blackballed" from that point going forward.  Mr. Kaepernick's protest against racial injustice deterred all 32 NFL teams from offering a contract to a quarterback with quality NFL experience and immense talent.  As just one example, the New York Giants suggested that the reason the team did not consider Mr. Kaepernick was because the team's owner feared backlash—a statement that journalists understandably labeled "dangerous."[4]

31.      Then-President Donald J. Trump supported the "blackballing" of Mr. Kaepernick, called on the nearly all-white NFL owners to "fire" any player who protested during the national anthem and referred to Mr. Kaepernick as "that Son of a Bitch."  Neither the NFL as a league nor any of the team owners came to Mr. Kaepernick's defense.

32.      In fact, in an October 2017 meeting among owners, players and league executives to address racial injustice protests, NFL owners effectively endorsed President Trump's opinion that a player who protests racial injustice is a "Son of a Bitch" and stated an unwillingness to act

---

[4]      See Biderman, Chris, *Why Giants Owner John Mara's Statement on Colin Kaepernick is dangerous*, USA TODAY, (May 29, 2017), https://ninerswire.usatoday.com/2017/05/29/why-giants-owner-john-maras-statement-on-colin-kaepernick-is-dangerous/.

contrary to Trump's directives.[5]  Mr. Kaepernick remained "blackballed" thereafter despite being unquestionably skilled enough to be on a roster.

33.     Mr. Pegula stated his opinion that Mr. Kaepernick's disenfranchisement was a "media problem" and proposed that the NFL needed a spokesperson to promote the league's image.  Mr. Pegula suggested that the spokesperson be Black in order to placate the media: "For us to have a face, as an African-American, at least a face that could be in the media, we could fall in behind that."[6]  This statement exemplifies the NFL's focus on "appearing" inclusive when it is advantageous from a business or public relations angle, while not actually embracing the concept of diversity in any meaningful manner.

34.     Year after year, Mr. Kaepernick remained sidelined and never received any genuine interest from NFL teams.  While some owners gave lip service to solidarity with Black players, NFL owners collectively refused to employ Mr. Kaepernick following his racial justice protests.  Mr. Kaepernick's career is now effectively over—cut short by the NFL's unwillingness to employ a player who protested discrimination.[7]

**C.     Heinous Discrimination by Head Coach Jon Gruden**

35.     Jon Gruden, the 30-year NFL insider and three-time Head Coach, has become an embodiment of the NFL's acquiescence to racism.  In 2018, the Las Vegas Raiders signed Mr. Gruden to the largest head coach contract in history—a 10-year, $100 million deal.

---

[5]     See McCann, Michael, *The Leaked October Tapes and the Kaepernick Collusion Case*, SPORTS ILLUSTRATED, (Apr. 25, 2018), https://www.si.com/nfl/2018/04/25/leaked-tapes-nfl-owners-players-october-meeting-kaepernick-collusion-case-donald-trump.

[6]     See Belson, Ken et al., *Inside the Confidential NFL Meeting to Discuss National Anthem Protests*, NY Times (April 25, 2018), https://www.nytimes.com/2018/04/25/sports/nfl-owners-kaepernick.html

[7]     In May 2018, the NFL implemented a policy that gave players the option to stay in the locker room during the national anthem, but required players on the field to stand and "show respect."  If a player failed to comply, his team could be fined and the player could be disciplined.  This policy was created without input or approval by the NFLPA.  The NFL rolled this policy back two months later after it proved to be a public relations disaster.

36.     In October 2021, it was disclosed that between 2011 and 2018, Mr. Gruden exchanged a slew of emails containing racist, misogynistic and homophobic slurs to the Washington Commanders' then-General Manager Bruce Allen.  Among the remarks, Mr. Gruden stated that DeMaurice Smith, the NFL Players' Association Executive Director, had "lips the size of Michelin tires."  Mr. Gruden also stated that players who protested the national anthem to protest racial inequality should be "fired."

37.     Mr. Gruden's emails also contained a slew of additional offensive conduct.  The emails referred to Mr. Goodell as a "faggot" and a "clueless anti-football pussy," and said Mr. Goodell should not have pressured the Rams to draft "queers" (referring to the drafting of Michael Sam, the first openly gay player drafted by an NFL team in 2014).

38.     Given Mr. Gruden's long history in the NFL's inner circle, it is highly improbable that his animus towards Black people and other protected groups was not well known to many. Even on the emails that surfaced, numerous senior level employees within the Commander's organization were recipients and did absolutely nothing to report Mr. Gruden's racist conduct.

39.     Yet, Mr. Gruden remained an NFL insider for years to the point that he was ultimately offered a $100 million contract.

40.     The NFL's handling of this situation is one of the purest illustrations of its unspoken NFL mantra to "protect the shield," meaning no matter how serious the transgression, how hurtful the sentiment, the NFL's main priority is to shield itself from blame.

41.     In "protecting the shield" the NFL ignored pervasive racism, sexism, harassment, and other offensive conduct.  It is this atmosphere and culture that prompted the NFL to allow Mr. Gruden to remain an NFL insider despite broad knowledge that he harbors discriminatory animus towards Black people and others.

D.   **Race-Norming in The NFL's Concussion Settlement**

42.   In 2011, retired NFL players began filing personal injury actions related to concussion and brain injuries, most of which were ultimately resolved through a class action settlement.  As part of the settlement, claims for monetary awards would be first reviewed by a claims administrator but would be subject to an appeals process.

43.   According to a lawsuit filed by former Black NFL players Kevin Henry and Najeh Davenport, as well as media reports, the NFL began regularly insisting that physicians use "race-norms" in determining whether a retiree had suffered cognitive impairment (the "Race-Norming Lawsuit").  When Black retirees were deemed to be cognitively impaired from their NFL careers, the NFL regularly appealed such determinations if race-norming was not used.

44.   As alleged in the Race-Norming Lawsuit,

> [T]he National Football League . . . [has] been avoiding paying head-injury claims under the Settlement Agreement based on a formula for identifying qualifying diagnoses that explicitly and deliberately discriminates on the basis of race.  When being evaluated for the Qualifying Diagnoses of Neurocognitive Impairment, Black former players are automatically assumed (through a statistical manipulation called 'race-norming') to have started with worse cognitive functioning than white former players.  As a result, if a Black former player and a white former player receive the exact same raw scores on a battery of tests designed to measure their current cognitive functioning, the Black player is presumed to have suffered less impairment, and he is therefore less likely to qualify for compensation.

45.   Put another way, the NFL not only insisted that white people simply have better cognitive function than Black people, but the league also did this in a context that would lead to reduced recovery for Black players relative to white players.  The NFL's assumption that someone is not as cognitively advanced as another person because of the color of his skin is the very definition of racism and is abhorrent.

E.    **The NFL's Attempt to Pander During Widespread, Societal Racial Protests**

46.    In June 2020, following protests over George Floyd's murder and other racially

charged violence, Mr. Goodell publicly apologized for the NFL's previous response to player

protests saying, "We were wrong for not listening to NFL players earlier."[8]

47.    Despite the blatant collusion against Mr. Kaepernick, Mr. Goodell self-servingly

declared in a publicly released video that "Black Lives Matter" and announced that the NFL

desired to work with Mr. Kaepernick in the creation of a $250 million foundation for social

justice initiative.[9]  The NFL also unveiled the slogan, "End Racism," which would be painted

into the endzones during NFL games for the duration of the 2020-21 season.

48.    These actions were widely criticized as an attempt to pander to growing public

sentiment against racial injustice rather than as a genuine attempt by the NFL to turn the corner

and legitimately stand against discrimination.  As stated by Jemele Hill of The Atlantic:

> As unrest spreads across the nation, the NFL does not get to act as
> if it always stood with Kaepernick or the other players who followed
> his lead. Not when the league has shown itself to be a fake ally, an
> obstacle in the pursuit of social justice and equality, and a reflection
> of the racism that it says it stands against.
>
> Yesterday, many NFL teams took part in #blackouttuesday—an
> activist-driven social-media protest that encouraged people to post
> black squares on their social-media platforms in observance of
> Floyd's murder and the need to confront racism and inequality. But
> when the league had the opportunity to be on the right side of
> history, it chose the coward's path. It stood idly by as Kaepernick's
> message was lazily characterized as anti-American and disrespectful
> toward veterans—or was co-opted by public-relations gestures
> intended to dilute it.
>
> Never forget that when Goodell was first asked about Kaepernick's
> protest, the commissioner said, "I don't necessarily agree with what

---

[8]      See *Roger Goodell: NFL "wrong" for not listening to protesting players earlier*, NFL.COM, (Jun. 5,
2020), https://www.nfl.com/news/roger-goodell-nfl-wrong-for-not-listening-to-protesting-players-earlier.
[9]      See Battista, Judy, *NFL commits $250M over 10-year period to combat systemic racism*, NFL.COM, (Jun.
11, 2020), https://www.nfl.com/news/nfl-commits-250m-over-10-year-period-to-combat-systemic-racism.

he's doing." The 49ers, who expressed support on Twitter and Facebook for the Black Lives Matter movement yesterday, essentially pushed Kaepernick out in 2017.[10]

**F.**     **The NFL's Attempt to Pander Following the Filing of Brian Flores' Lawsuit**

49.     The filing of the Brian Flores race discrimination class action lawsuit on February 1, 2022, provided yet another moment of public outcry for the NFL to step up—but it has not. After Mr. Flores filed his action, the NFL quickly rejected his claims as being "without merit" without having conducted any investigation whatsoever.

50.     After public backlash, Mr. Goodell tried to change course and stated: "To me, it's more important for us to sort of listen to Coach [Flores], understand the points he and other coaches are going through, what our clubs are going through, what feedback they have, and also again, re-evaluate everything we're doing."

51.     But the NFL and Mr. Goodell then reportedly rejected Mr. Flores' request to engage in a structured and meaningful dialogue.  Moreover, the NFL has attempted to force the matter into private and secretive arbitration where there is no transparency and where it can hide from public scrutiny.

52.     Eventually, the NFL created a diversity advisory committee.[11]  However, since the creation of this committee, there have not been any reported changes that have come out of it with respect to the way the NFL operates on issues of racial diversity.

53.     The NFL also created the Coach and Front Office Accelerator Program intended to "promote[] greater coach and c-suite level diversity among clubs" by providing a setting for Black and minority coaches to have face to face interaction with team representatives.  The idea

---

[10]     See Hill, Jemele, *The NFL is Suddenly Worried About Black Lives*, The Atlantic, (June 3, 2020), https://www.theatlantic.com/ideas/archive/2020/06/nfls-amnesia-just-like-americas/612505/
[11]     See *NFL Announces Diversity Advisory Committee Members*, NFL Football Operations, (March 28, 2022), https://operations.nfl.com/updates/football-ops/nfl-announces-diversity-advisory-committee-members/ .

that a short face-to-face interaction with ownership would meaningfully increase the number of Black professionals in meaningful positions is illustrative of the NFL's failure to accept and address the significance of its problems with respect to racial diversity.[12]

54.     The representation of Black people in coaches and executives ranks within NFL teams has remained deplorable following the <u>Flores</u> action, and no meaningful measures have been put in place to reverse this problem despite numerous suggestions offered not only by in the <u>Flores</u> action, but separately by the NFLPA in a scathing report issued on July 5, 2023.[13]

### G.     NFL Owners Have Engaged in Numerous Instances of Bigotry

55.     The NFL's inability to address systemic racism starts at the top with team owners who have engaged in numerous instances of bigotry that have been reported and, upon information and belief, numerous other instances of discrimination that have not been reported and have remained behind closed doors.  Some examples follow.

56.     As one example, in 2022, the Washington Post published a photograph from 1957, three years after the seminal Supreme Court case <u>Brown v. Board of Education</u>, depicting a group of white students intimidating and blocking a group of Black students who were participating in the desegregation of their school.  NFL owner Jerry Jones, a youth at the time, was among the white students engaged in this conduct.[14]

57.     After this photograph gained national attention, Mr. Jones commented on his presence.  Mr. Jones attempted to minimize the significance of the moment and claimed he did

---

[12]      The NFL has done other similar "Accelerator" programs that have not had any demonstrable impact.  <u>See</u> <u>e.g.</u> Bell, Jarrett, *With monumental NFL lawsuit, Brian Flores bold stepped where others desired*, USA Today, (October 2, 2022), https://www.usatoday.com/story/sports/nfl/columnist/bell/2022/10/02/brian-flores-lawsuit-change-anything-black-nfl-coaches/8152808001/; *Unpacking 'discouraging' NFL accelerator program*, Yahoo Sports, (May 18, 2023), https://sports.yahoo.com/unpacking-discouraging-nfl-accelerator-program-201502705.html.
[13]      <u>See</u> Smith, DeMaurice, Lasker, Carl, *The Rooney "Suggestion,"* NFLPA, (July 5, 2023), https://nflpa.com/posts/the-rooney-suggestion .
[14]      <u>See</u> <u>e.g.</u> Hill, Jemele, *The Jerry Jones Photo Explains a Lot*, The Atlantic, (December 4, 2022), https://www.theatlantic.com/ideas/archive/2022/12/jerry-jones-nfl-racism-photo/672342/

not fully appreciate the situation at the time.[15]  Mr. Jones took no responsibility or ownership for his involvement in the scene depicted in the photograph.

58.    As another example, it was reported in 2020 that the owner of the New York Jets and former U.S. Ambassador to Britain, Woody Johnson, was the subject of a State Department investigation into reports that he made Black members of his government staff uncomfortable due to frequent racist remarks.

59.    A Black female diplomat told colleagues that in response to scheduling events during Black History month, Mr. Johnson asked if he was going to speak to an audience that was, "just a bunch of Black people" and told her that she was "marginalizing herself."[16]  Mr. Johnson also "questioned why the Black community celebrates Black History Month," and argued that the "real challenge" was that Black fathers did not remain with their families.[17]

60.    As another example, in 2017, at an NFL owner's meeting, Bob McNair, then-owner of the Houston Texans, stated of Mr. Kaepernick and others' racial injustice protests, "We can't have the inmates running the prison."  Of course, referring to players, the majority of which are Black, as "inmates" has obvious racial meaning.  Mr. McNair apologized, but later retracted his apology stating, "I didn't really have anything to apologize for." [18]

61.    These are just a few examples of the openly racist and discriminatory mindset with which NFL owners conduct their business and run the NFL.  And importantly, it only

---

[15]     See Philip Bump, *A 1957 Photo of Jerry Jones Reminds Us How Recent America's Past Is*, The Washington Post, (November 30, 2022), https://www.washingtonpost.com/politics/2022/11/30/1957-photo-jerry-jones-reminds-us-how-recent-americas-past-is/
[16]     See Ken Belson, *As N.F.L. Fights Racism and Sexism, Team Owners Undercut the Message, New York Times*, (July 25, 2020), https://www.nytimes.com/2020/07/25/sports/football/woody-johnson-trump-jets.html
[17]     See Jennifer Hansler, Kylie Atwood and Nicole Gaouette, *NFL Owner and Trump ambassador to UK sparks watchdog inquiry over allegations of racist and sexist remarks and push to promote Trump business*, CNN.com, (July 22, 2020), https://www.cnn.com/2020/07/22/politics/woody-johnson-oig-report/index.html
[18]     See Seth Wickersham and Don Van Natta Jr., *Gaffes, TV ratings concerns dominated as NFL, players forged anthem peace*, ESPN.com, (October 27, 2017), https://www.espn.com/espn/otl/story/_/id/21170410/gaffes-tv-ratings-concerns-dominated-nfl-players-forged-anthem-peace-league-meetings

further explains the NFL's failure to take appropriate measures to eradicate discrimination from the operations of the NFL and its various business lines.

### H.   The NFL Has Barriers to Entry For Black Leaders

62.     As has been widely reported, the NFL has foreclosed Black people from leadership positions since its inception, and that continues to the present day.  There is not a single Black majority owner of any NFL franchise and there never has been.  There has never been a Black Commissioner of the league.

63.     The lack of racial diversity in team and league leadership filters down into front office and coaching positions.  There are currently only 8 Black General Managers out of the 32 NFL teams.  Moreover, only 3 teams have head coaches who identify as Black.  This is despite the fact that the pool of people from which these positions are often filled is a player population which is reported to be 60-70% Black.

64.     The NFL acknowledged years ago that it was not providing adequate opportunities for Black head coaches and for that reason in 2002 instituted the "Rooney Rule" which, *inter alia*, obligates teams to interview minority candidates for head coach and other leadership positions.  However, after more than 20 years, the representation of Black head coaches in the NFL has remained virtually unchanged.

65.     In fact, many have reported that the "Rooney Rule" has only subjected Black candidates to further humiliation as forced to engage in "sham" interviews with no *bona fide* opportunity at obtaining the position.  There are numerous specific examples of this which have been widely reported, and include Ray Horton, Brian Flores and Eugene Chung.

66.     The failures of the "Rooney Rule" and the institutional discrimination that

pervades the NFL led to the filing of the <u>Flores</u> class action discrimination lawsuit in which the

NFL's history of discrimination was set forth in detail.

67.     But barriers to entry within the NFL are not limited to the teams and the senior

positions within those organizations.  As Mr. Trotter would learn, and as described below, the

NFL itself and NFL newsroom also lack sufficient Black representation.

## II.     JIM TROTTER'S IMPECABLE RESUME AS A JOURNALIST

68.     It hardly needs to be stated that Mr. Trotter is a widely respected, highly

renowned and award-winning journalist who has been reporting on sports for more than 30

years, with a focus and emphasis on football and the NFL.

69.     Following his graduation from Howard University with a degree in Broadcast

Journalism in 1986, Mr. Trotter's experience has included tenures working for among the most

prominent sports media organizations including Sports Illustrated (2007 to 2014), ESPN (2014 to

2018), the NFL (2018 to 2023) and currently The Athletic (2023 to present).

70.     Mr. Trotter has written numerous important articles that transcend sports and

involve the intersection between sports and social issues.  Some examples are as follows:

- "The New Silver and Black," Sports Illustrated, (April 22, 2013), which concerns the hiring of Black GM Reggie McKenzie by the Raiders and his journey to rebuilding the Raiders after the team went through 10 straight losing seasons.

- "Eric Bieniemy, Byron Leftwich left waiting as number of Black NFL head coaches stagnates," NFL.com (February 2, 2021), where Mr. Trotter discussed Mr. Bieniemy and Mr. Leftwich's prowess as offensive coordinators and the absence of an explanation, other than race, as to why both men have been passed over for head coaching positions.

- "Does race remain a factor in the evaluation of NFL Quarterbacks?" NFL.com (February 24, 2021), in which Mr. Trotter wrote about the history of Black quarterbacks in the NFL and how sentiment around Black

quarterbacks has changed since the days of Warren Moon, James Harris
and Randall Cunningham.

- "To further equality, NFL must be transparent in Eugene Chung case,"
  and "Does race remain a factor in the evaluation of NFL quarterbacks?"
  NFL.com, (May 28, 2021), which concerned the allegations brought
  forward by former player and assistant coach of Korean descent that an
  interviewer for an NFL team told him he was "not the right minority" for a
  coaching position as well as a question about whether the NFL will be
  transparent in its investigation.

- "Brian Flores' lawsuit reflects widespread discontent among Black
  Coaches over NFL hiring practices," NFL.com, (February 10, 2022),
  where Mr. Trotter described the <u>Flores</u> lawsuit and why the case was a
  reflection of the way that Black professionals working or aspiring to work
  for the NFL felt about their employer's treatment of Black professionals.

- "Pittsburgh Steelers' history shows power of inclusive hiring practices,"
  NFL.com (June 16, 2022), in which Mr. Trotter reported on the history of
  the Steelers' organization and its commitment to diversity stemming from
  late owner, Dan Rooney.

71.     In 2016, Mr. Trotter published a book titled "Junior Seau: The Life and Death of a
Football Icon" which described Mr. Seau's tragic death and his diagnosis of chronic traumatic
encephalopathy ("CTE") at a time when there remained a significant lack of understanding as to
how repeated head trauma impacts the NFL's players.

72.     The book received wide critical praise, including from Lars Anderson who said,
"Few people knew Junior Seau like Jim Trotter, who gracefully guides readers into the unique
world of one of the NFL's most compelling figures of the last quarter-century. Trotter has
achieved something rare here: he took a sports book and artistically crafted it into a lyrical
narrative about dreams, love and, ultimately, heart-wrenching loss."[19]

73.     Mr. Trotter has developed a reputation for his hard-hitting reporting, refusing to
"pull punches" and delving deep into stories that go beyond "the field" and address matters

---

[19]     See https://www.amazon.com/Junior-Seau-Life-Death-Football/dp/0544811895

impacting society at large. Mr. Trotter views his position as a journalist as one that carries an important responsibility, and he has earned industry-wide respect for his approach to journalism.

74.  In 2007, Mr. Trotter was designated the honor of being a voter for the Pro Football Hall of Fame, a distinction he maintained for the last 16 years. This honor is only bestowed upon up to 50 people for any given year. In 2020, there were only five Black writers, including Mr. Trotter, out of 48 people voting on induction to Pro Football Hall of Fame.[20]

75.  In 2017, Mr. Trotter was selected to serve as the President of the Pro Football Writers of America ("PFWA"), a recognition of his reputation and integrity by his media colleagues. The PFWA serves as the official voice of pro football writers, promoting and fighting for access to NFL personnel to best serve the public since 1963.[21]

76.  In 2021, Mr. Trotter received the Excellence in Media Award from the National Coalition of Minority Football Coaches, an organization which serves to remove roadblocks to coaching and management opportunities for minorities through advocacy, education, and professional development programming.[22]

77.  In August 2023, Mr. Trotter was a recipient of the prestigious Bill Nunn Jr. Award from the PFWA and Pro Football Hall of Fame, an award given to a reporter who has made a long and distinguished contribution to pro football through coverage.[23]

---

[20]    See Weiss, Martin, *With Pro Football Hall of Fame Voters So White, Members Call for Diversity*, Deadspin.com, (July 3, 2020), https://deadspin.com/with-pro-football-hall-of-fame-voters-so-white-members-1844253646#:~:text=Of%20the%2048%20media%20members,key%20to%20Canton%20are%20white

[21]    See *About The PFWA*, Pro Football Writers of America, https://www.profootballwriters.org/

[22]    See *Our Mission*, National Coalition of Minority Football Coaches, https://ncmfc.com/our-mission/

[23]    See PFWA, *Jim Trotter Selected as PFWA 2023 Bull Nunn Jr. Award winner*, profootballwriters.org, (May 17, 2023), https://www.profootballwriters.org/2023/05/17/jim-trotter-selected-as-pfwa-2023-bill-nunn-jr-award-winner/.

78.     In August 2023, Mr. Trotter won the National Association of Black Journalists ("NABJ"), Journalist of the Year award in recognition of his three decades of covering the NFL and his accomplishments which support the Black community in news and media.[24]

79.     In sum, Mr. Trotter is a highly respected journalist with an impeccable reputation, considered among the leading football journalists of his generation and a trailblazer for others.

## III.   MR. TROTTER'S EMPLOYMENT AT THE NFL

### A.   The NFL Team Owners, the NFL and NFL Media are a Single Enterprise

80.     The NFL has a media operation, referred to herein as NFL Media, which is in all respects run and controlled by the NFL and serves to advance the interests and generate revenue for the NFL and the team owners.

81.     The NFL is an organization run, operated and controlled by the NFL team owners.  All aspects of NFL league operations are controlled by either the NFL team owners or their hired delegates, such as the NFL Commissioner who serves at their leisure and behest.

82.     The NFL member teams determine the appointment and retention of the Commissioner at all times.  The NFL Constitution and Bylaws ("NFL Constitution") provide for the Commissioner to assert financial control over the interests of the NFL and enter into contracts on behalf of the member organizations.

83.     The NFL and the NFL teams have a complete interrelation of ownership, management, operations and financial control.  Under the NFL Constitution, the NFL exists at

---

[24]     See Stewart, K, *NABJ Announces 2023 Hall of Fame Inductees and Special Honors Recipients*, NABJonline.org, (June 27, 2023), https://nabjonline.org/blog/nabj-announces-2023-hall-of-fame-inductees-and-special-honors-recipients/amp/

the behest of and is controlled by the NFL teams.  The stated purpose of the NFL is to "promote and foster the business of the League members [teams]."[25]

84.    NFL Media is nothing more than an arm of the NFL.  NFL Media and all of its content, messaging and programing are controlled through the NFL league office which is controlled by the team owners.

85.    The NFL teams each own equal shares and rights in NFL Media.

86.    The NFL and NFL Media have an interrelation of operations as NFL Media reports into the NFL league office and the NFL league office has an officer specifically designated to manage and control NFL Media.

87.    The NFL and NFL Media share the same offices and personnel.

88.    Both the NFL and NFL Media ultimately report to the NFL team owners.

89.    As demonstrated below, Mr. Trotter, throughout his employment, was given direct and indirect directives regarding the content of his reporting that came not merely from his supervisors but from the NFL league office, demonstrating that NFL Media does not in any way, shape or form operate as an independent organization.

90.    In fact, not only is NFL Media not "independent," but the NFL uses NFL Media as a quasi-marketing department and as an instrument to "protect the shield" of the NFL.

91.    Thus, while Mr. Trotter's direct employer was technically NFL Media, his true operational and functional employer was at all times the NFL and the team owners who control all aspects of the NFL.

---

[25]    See *Constitution and Bylaws of the National Football League*, NATIONAL FOOTBALL LEAGUE, (Feb. 1, 1970 (2006 Rev.), https://www.onlabor.org/wp-content/uploads/2017/04/co_.pdf.

### B.      Mr. Trotter's Employment at the NFL

92.      In early 2018, while Mr. Trotter was working for ESPN, he was approached by Galen Gordon (currently, Senior Vice President at ABC News) who was at the time in the process of leaving ESPN to become the Senior Vice President of Talent with NFL Media, who asked if Mr. Trotter would be interested in working as a columnist for the NFL.

93.      Mr. Trotter informed Mr. Gordon that he had two years remaining on his ESPN contract and would only consider moving to the NFL if there was an alignment with NFL leadership on the vision for his role.  In particular, Mr. Trotter said he wanted to focus reporting on player activism, humanizing the players by "taking off their helmets" and the important trends and social issues impacting the NFL and its players, including issues involving racial injustice.

94.      Following a series of conversations and interviews, Mr. Trotter was given assurances that he and the NFL were aligned in this approach.  The NFL and Mr. Trotter entered into a two-year contract that ran through the end of March 2020.  Mr. Trotter was expected to provide written and television media content to the NFL that was consistent with the journalism Mr. Trotter had been recognized for throughout his career.

95.      At the end of his initial contract, Mr. Trotter's employment was renewed with a three-year extension that ran from April 1, 2020 through March 31, 2023, with the contract contemplating further renewal thereafter.  In fact, Mr. Trotter's contract required him to provide the NFL with an opportunity to match any competing offer and guaranteed the NFL the exclusive negotiating rights during the 90 days preceding the end of the contract term.

96.      Immediately after Mr. Trotter started, he observed a dearth of Black managers in the NFL newsroom and the complete lack of Black full-time employees on the news desk. Specifically, Mr. Trotter's direct manager at the time was John Marvel (then NFL Media, Head

of Digital Content) and he reported to Todd Sperry (NFL Media, Head of Digital and Television Media), both of whom are white. Mr. Sperry, in turn, reported to the David Jurenka (NFL Media Senior Vice President), who is also white. From there, the reporting line moves to the NFL league office.

97.    Mr. Jurenka reported to the NFL league office and specifically to Hans Schroeder (Chief Operating Officer of NFL Media), who is also white. Mr. Schroeder reported to Brian Rolapp (the NFL Chief Media and Business Officer), also white. Mr. Rolapp reported to Mr. Goodell, who is also white. Mr. Goodell, of course, reports to the NFL team owners, whose lack of diversity is discussed above. The following graphic reflects the reporting chain:



NFL Team Owners

Rodger Goodell, NFL Commissioner

Brian Rolapp, CEO, NFL Network

Hans Schroeder, COO, NFL Media

NFL League Office

David Jurenka, Head of NFL Media

Mark Quenzel, SVP NFL Media

Todd Sperry, Executive Editor NFL Network

John Marvel, then-NFL Media, Head of Digital Content

Jim Trotter, then-NFL Network Reporter

NFL Media

98.     Even looking more closely at the news desk, NFL Media does not employ a single Black full-time employee.  The news desk throughout Mr. Trotter's tenure constituted approximately 10-15 full-time employees.

99.     Throughout Mr. Trotter's tenure at the NFL, made inquiries regarding the racial makeup of NFL employees as he viewed this as a serious issue which required remediation.

100.     For example, in 2021, Mr. Trotter communicated with a senior NFL executive to acquire data on the number of Black people in Executive Vice President positions and above within the NFL league offices and was told that there were only two out of 12 (16 percent).  Mr. Trotter then asked this same executive how many Black employees there were across the NFL league offices (New York, New Jersey and Los Angeles) and was told it was only approximately 157 Black employees out of approximately 1,950 people (8 percent).

101.     Mr. Trotter also asked Mr. Sperry, the head of the news desk, to confirm his understanding that there was not a single full-time Black employee working on the news desk. Mr. Sperry confirmed in writing that Mr. Trotter's understanding was correct, though also expressed concern regarding Mr. Trotter's inquiry and implored Mr. Trotter not to speak publicly regarding this lack of diversity.

102.     Mr. Trotter viewed the lack of Black people on the news desk, and the lack of Black managers in the news room, to be part of the well-documented pattern of systemic and institutional race discrimination within the NFL which the NFL and its owners have refused to address for decades and generations.

103.     Mr. Trotter felt duty bound to speak up about these matters, and did so both in his reporting and in his internal communications with the NFL.  Mr. Trotter called the NFL out for its lack of inclusivity in numerous articles and TV appearances.

104. Thankfully, Mr. Marvel—Mr. Trotter's manager when he started at the NFL—was a champion of Mr. Trotter and his unwillingness to accept the status quo. However, Mr. Marvel also let Mr. Trotter know that not everyone in the NFL was as accepting of diverse opinions that were critical of the NFL's record on race discrimination.

105. Mr. Marvel reminded Mr. Trotter that the newsroom and NFL Media reported to the NFL league office. It was clear to Mr. Trotter that he had to tread carefully whether speaking about these matters informally or reporting on these matters externally in connection with his journalistic work because the NFL and the team owners were ultimately his employer.

106. But Mr. Trotter is highly principled and was undeterred. Mr. Trotter felt that not only was racial diversity at the NFL an institutional problem that needed to be addressed, he also felt that racial diversity in the newsroom was particularly important given that they were largely reporting on stories and events involving Black players and without Black voices and opinions involved in decision making roles, the necessary cultural context and perspectives were excluded.

107. As just one external example, early on in his tenure at the NFL, Mr. Trotter did a TV appearance on NFL NOW (the NFL's digital video news program) where he mentioned that the lack of Black representation among NFL head coaches was an area where the league was failing in its purported commitment to diversity, equity and inclusion. In the same segment, Mr. Trotter stated that the NFL newsroom similarly lacked Black leadership.

108. There are numerous other examples. While Mr. Trotter's outspokenness on issues of discrimination did not seed any change in the newsroom or otherwise during his early years at the NFL, at the very least Mr. Trotter felt that he had an ally in Mr. Marvel who supported his

desire to address issues of systemic racism in the NFL notwithstanding potential pushback and discontent by the NFL and team owners.

109.    Unfortunately, in or around June 2021, Mr. Marvel was let go and replaced by Ali Bhanpuri.  Mr. Bhanpuri did not share Mr. Marvel's support for Mr. Trotter or Mr. Totter's critical view on the NFL's problems with racism.  Mr. Bhanpuri deterred Mr. Trotter from speaking up about these matters within the workplace or engaging in critical reporting about racial injustice within the NFL.

### C.   The NFL Instructs Mr. Trotter Not to Report Racist Conduct by Dallas Cowboys Owner Jerry Jones; NFL Also Takes No Internal Action

110.    On or about October 12, 2021, Mr. Trotter was preparing to do an NFL NOW appearance to discuss Jon Gruden's resignation from the Las Vegas Raiders after emails surfaced of him making numerous offensive remarks, including racist remarks regarding DeMaurice Smith, Executive Director of the NFLPA.

111.    In preparation for his TV appearance, Mr. Trotter informed Mr. Bhanpuri that as part of a larger discussion about racism in the NFL and dismissiveness towards Black people he was planning to report on a racist statement Dallas Cowboys owner Jerry Jones made at the 2020 Pro Football Hall of Fame Game in Canton, Ohio.  A description of the incident and some necessary background follows.

112.    On or about August 6, 2020, Mr. Trotter attended the Hall of Fame Game—that year an exhibition between the Dallas Cowboys and Pittsburgh Steelers.  Before the game, Mr. Trotter was congregating on the field with other reporters and members of the NFL.

113.    At one point, Mr. Trotter was speaking to Will McClay, the Cowboy's Vice President of Player Personnel, about the fact that NFL teams tend not to draft many players out of Historically Black Colleges and Universities ("HBCUs") and whether that might be due to the

lack of Black people in personnel decision-making positions—i.e. General Managers.  Mr. Jones

joined the conversation, and Mr. Trotter asked why teams have so few Black decision makers.

114.    In response to Mr. Trotter, Mr. Jones dodged the question and stated that players

get a large percentage of league revenue and the majority of players are Black.  In effect, Mr.

Jones was stating that Black people should "be happy for what they have" and not seek further

advancement of their rights, positions in society or equality.

115.    Mr. Trotter reiterated his question, and Mr. Jones responded, "I'm starting to feel

a little defensive."  However, notwithstanding Mr. Jones' previous answer or history of conduct,

Mr. Trotter made it clear that he was not attacking him, or even speaking about the Cowboys, but

just asking about the league generally.

116.    Mr. Jones finally responded: "**If Blacks feel some kind of way, they should buy

their own team and hire who they want to hire**."  Mr. Trotter responded by asking if the NFL

was going to change its rules requiring purchasers to buy at least 30% of the team and finance

deals with no more than $1 billion in debt.[26]  Mr. Jones ignored the question.

117.    Towards the end of the conversation, Pittsburgh Steelers owner Art Rooney II

arrived.  At that point, Mr. Jones said in sum and substance that he and Mr. Trotter should "agree

to disagree" about the NFL's issues with race.  It was an awkward moment for Mr. Rooney who

had joined a rather contentious conversation without knowing the topic being discussed.  The

following morning, Mr. Trotter apologized to Mr. Rooney for being brought into that situation.

---

[26]      These rules are widely understood to further limit the scope of people with sufficient wealth to the upper-most reaches of the uber financial elite, where Black representation is even lower than across all billionaires.  See e.g. Lawrence Corbett, Merlisa, *Why are there so few Black Team owners in US professional sports?*, The Guardian, (March 14, 2023), https://www.theguardian.com/business/2023/mar/14/us-black-owners-professional-sports-teams.

118.    Needless to say, Mr. Jones' remark that "If Blacks feel some kind of way, they should buy their own team and hire who they want to hire" is highly offensive as it suggests that Black people's rights should only be the concern of Black people.

119.    However, Mr. Jones' remark is consistent with the NFL's record on race discrimination—if the NFL and its owners do not feel that issues facing Black people are an issue incumbent on them to address, it explains the lack Black owners, the lack of Black executives, the lack of Black head coaches, and the lack of Black people working in NFL Media.

120.    Thus, this was the incident Mr. Trotter was referring to before he appeared on NFL Now.  Following Mr. Trotter's stated intention to bring this up, Mr. Bhanpuri notified Mr. Sperry.  Mr. Sperry then reached out to Mr. Trotter via text and directed him to, "refrain from discussing the Jerry Jones quote until you, me and Ali [Bhanpuri] have had a chance to discuss. Ali and I were discussing and wondering if there's any additional context around that quote?"

121.    Thereafter, Mr. Trotter, Mr. Bhanpuri and Mr. Sperry spoke (before Mr. Trotter went on air) and Mr. Bhanpuri and Mr. Sperry together instructed Mr. Trotter not to mention Mr. Jones' comments on-air.

122.    Pursuant to Mr. Bhanpuri and Mr. Sperry's instruction, Mr. Trotter did not. However, Mr. Trotter still reported that Mr. Gruden incident was emblematic of the NFL's many problems with racism.  Mr. Trotter voiced his objection to the NFL's conduct, saying in part:

> Something has to be done here.  And it's not about slogans.  It's not about hashtags.  It's not about playing the Black national anthem. It's not about giving money to social justice cases.  You have to have diverse leadership at the top so that _**we**_ are in the room when some of these conversations are taking place.[27]

---

[27]    See https://twitter.com/JimTrotter_NFL/status/1448064545243779076/video/1 (emphasis added).

123.    Around the same time, after Mr. Gruden's emails surfaced, the NFL issued a mass email to employees stating that "We would like to remind everyone that we take our NFL values seriously.  Our HR department and our leaders are always available to support anyone who feels that these values have been compromised."

124.    However, Mr. Trotter repeatedly made it clear to the NFL leaders—both in his reporting and in private communications—that he did not feel the NFL was living up to its sentiments or stated values.  No one from the NFL ever approached Mr. Trotter to discuss his concerns or engage Mr. Trotter in any other dialogue.

**D.     The NFL Takes No Action in Response to Racist Conduct by Buffalo Bills Team Owner Terry Pegula; Complaints "Swept Under the Rug."**

125.    On September 3, 2020, a large NFL Media zoom meeting was held which included approximately 40 newsroom employees.  The purpose of the meeting, during the middle of the pandemic, was to connect people who were not working together in-person and discuss various stories people were working on.

126.    During the meeting, an NFL Media reporter described a conversation he had with Buffalo Bills owner Terry Pegula in which Mr. Pegula was speaking about the recent emphasis on social activism by NFL players, and in particular support for Black Lives Matter.

127.    As reported, Mr. Pegula stated that, "**If the Black players don't like it here, they should go back to Africa and see how bad it is**."  This remark was so offensive and racist that the people in the meeting appeared to be frozen, unsure how to even react.

128.    Mr. Trotter would not stand by and spoke up.  In front of everyone in attendance, Mr. Trotter asked Mr. Marvel and Mr. Sperry if there was going to be a discussion about what Mr. Pegula had said given that it was so highly offensive and racist.  They responded that they would speak to the reporter about it further and decide how to handle the matter.

129.    Thereafter, Mr. Trotter sought out Mr. Marvel and Mr. Jurenka on a near weekly basis about what was being done to address Mr. Pegula's discriminatory remarks.  Mr. Trotter was repeatedly brushed off and told that "the league office is investigating it."

130.    However, this went on for months and Mr. Trotter never received any further update beyond this superficial statement.  Notably, no one from the NFL's league office ever reached out to Mr. Trotter to interview him in connection with any supposed "investigation" that was supposedly ongoing.  Clearly it was not a priority to investigate an NFL team owner's discriminatory animus and discriminatory remarks in conversations with employees.

131.    Nearly one year after the incident, Mr. Marvel told Mr. Trotter that the league had provided him with a response.  He told Mr. Trotter: "New York says it's an HR matter and that's the end of it."

132.    Thus, in response to an allegation by an employee (the reporter) and complaint by another employee (Mr. Trotter) that an NFL owner (an employer) made racist remarks that ridiculed Black players (also employees) for their social activism, the NFL did absolutely nothing.

133.    Mr. Trotter said to Mr. Marvel, "So we are sweeping this under the rug?"  Mr. Marvel responded, "I can only tell you what I've been told."

**E.    Following the *Flores* Class Action Lawsuit and the NFL's Dismissive Response; Mr. Trotter Publicly Challenges the NFL and Team Owners Regarding Widespread Discrimination Within the NFL**

134.    As set forth above, on February 1, 2022, the Flores race discrimination class action lawsuit was filed against the NFL alleging widespread discrimination against coaches and executives.  Despite widespread public support for the Flores lawsuit, the NFL issued an immediate and callous response stating that his lawsuit was "without merit."

135.    One week later, on February 9, 2022, on the Wednesday leading up to Super Bowl LVI (between the Los Angeles Rams and Cincinnati Bengals), NFL Commissioner Roger Goodell held his annual "State of the League" press conference.  Several questions from reporters during the press conference involved either the Flores lawsuit or related issues involving racial injustice and diversity in the NFL.

136.    Mr. Trotter decided to use the press conference as an opportunity to raise issues regarding the NFL workplace of which he was a member.  Specifically, Mr. Trotter made the following objection to the NFL's practices and posed questions to Mr. Goodell about how the matter would be addressed:[28]

> The question is more for the owners, but also for you. But, since they're not here, I'll ask you, as I always say. In your initial statement, in the League's initial statement, it said that diversity, equity, and inclusion were core principles of the NFL. And I need to provide some context before I ask you about that statement.
>
> In the 100+ year history of this league, 24 of 32 franchises have either had one Black head coach, or no Black head coaches.  And to make sure I get the names right, I'll read them off here. We've got: The Bills, The Commanders, The Cowboys, The Falcons, The Giants, The Jaguars, The Panthers, The Patriots, The Rams, the Ravens, The Saints, The Seahawks, The Titans, who have never had a Black head coach. That's nearly half the league. When you look at the fact that there's never been a majority Black owner, there's been one Black Club President, we look at the GMs now we're up to seven, five of those were hired in the last 12 months. We're now at three Black head coaches, two of them were hired after Brian Flores filed his lawsuit.
>
> So, it's easy to focus on the owners here, but I want to put this to you here: **when we look at the league office of the top 11 executives there, there are only two people of color.  When we look at NFL Media group where I work, there is not one Black person at the senior level in the newsroom who makes decisions about a league whose player population is 70% Black**.

---

[28]    See https://www.nfl.com/videos/roger-goodell-s-super-bowl-lvi-news-conference at 15:24-19:00 (emphasis added).

> **So as a member of the media group, and as a Black man, I ask, why does the NFL and its owners have such a difficult time at the highest levels hiring Black people into decision making positions?**

137.    As was clear from Mr. Trotter's statement, he was not asking this question merely in his capacity as a journalist.  He was asking the question as an employee of the NFL (i.e. "where I work" and "as a member of the media group").  Mr. Trotter was engaged in protected activity addressed to Mr. Goodell directly.

138.    Mr. Goodell responded as follows:

> Jim, yeah, listen, we look at the same numbers, and they're really part of the effort, again, looking at how do we become more effective in our policies and our procedures?  We work really hard, we believe in diversity, we believe in it as a value, we believe it's made it stronger.  People have come into the league who are diverse, have been very successful, and made us better.  And, we just have to do a better job.  We have to look, is there another thing that we can do to attracting that best talent here and making our league inclusive?  If I had the answer right now, I would give it to you. I would've – I think what we just have to do and find and look and step back and say "We're not doing a good enough job here. We need to find better solutions and better outcomes, and so, let's make it, let's find more effective policies, let's make sure everyone understands, let's make sure we are actually looking at diversity and incentivizing that for everyone in our building, including with compensation. Let's make sure that when we're dealing with vendors outside of the building, we're hiring diverse vendors. And bringing them in and giving them an opportunity to succeed just as we do with white vendors. Or people of color, how can they come in and contribute to the NFL. So, I think I think it's not a single answer, Jim, the single responsibility comes on all of us in the NFL, and we have to be the ones that make that change, and we are the ones that have to make sure we bring diversity deeper into our NFL and make the NFL an inclusive and diverse organization, that allows everyone the opportunity to be successful.

139.    Having raised these concerns to Mr. Goodell, and with Mr. Goodell's promise to be a part of future "change," still no one from the NFL—NFL Media, the league office, HR or otherwise—ever followed up with Mr. Trotter.

140.    Rather, the NFL ignored the remarks and acted as though Mr. Trotter's beliefs were "without merit" without conducting any further inquiry.  Thereafter, Mr. Trotter found himself subjected to further scrutiny and restrictions for having challenged the NFL's chief executive on issues of race discrimination in the hiring, retention and advancement of employees across the NFL.

**F.    Mr. Trotter Seeks to Expose the NFL's Lack of Sincerity with the Accelerator Program and is Silenced and Shut Down**

141.    On or about May 5, 2022, in large part as a response to public pressure and the league's continued problems in advancing Black coaches and executives, the NFL announced the creation of a new initiative called the NFL Coach and Front Office Accelerator Program ("Accelerator Program") (briefly described above).

142.    The Accelerator Program was yet another example of lip service and the NFL's desire to appear invested in diversity and inclusion but without any willingness to take meaningful action or put genuine protocols in place to achieve its stated goals.

143.    Mr. Trotter was one of many people skeptical of the NFL's intentions.

144.    For Mr. Trotter, the Accelerator Program sounded similar to the NFL's QB Coaching Summit, which started in 2019, and which was intended to shed light on the plight of minority coaches on the offensive side of the ball and to help identify and cultivate a pipeline of diverse coaches with a background of coaching quarterbacks by providing opportunities for minority coaches to network with team owners, current and former NFL coaches and college football coaches.[29]

---

[29]    See La Canfora, Jason, *NFL QB Coaching Summit: How a group of driven minority leaders are creating a path toward more diversity*, CBS Sports, (June 26, 2019), https://www.cbssports.com/nfl/news/nfl-qb-coaching-summit-how-a-group-of-driven-minority-leaders-are-creating-a-path-toward-more-diversity/

145.    However, the QB Coaching Summit appeared from the start to be nothing more than a half-measure.  In its first year, not a single NFL owner and only two General Managers even attended the QB Coaching Summit.  Thus, for an event intended to provide visibility for coaching candidates and give those candidates an opportunity to develop relationships with decisionmakers at NFL teams, it was clear the teams had minimal interest.

146.    Mr. Trotter felt that the Accelerator Program was another example of a public relations stunt with little chance of making any meaningful difference.  Accordingly, Mr. Trotter drafted a column in which he was critical of the NFL's efforts to achieve diversity in the coaching ranks and counted the Accelerator Program as yet program which was ill-conceived even if it had an appearance of being well-intentioned.

147.    Mr. Bhanpuri gave Mr. Trotter substantial pushback regarding his critique of the NFL.  Mr. Bhanpuri told Mr. Trotter that the article had to be more "balanced," i.e. more favorable to the NFL.  Mr. Trotter was also told that his article was "dismissive" towards the NFL and was told that "this week's event was positive" and that sentiment had to be reflected in the article.

148.    Mr. Trotter said he was being forced to write the article in a manner that NFL leadership wanted and not in a manner that reflected his genuine beliefs and opinions.  In one particular email, Mr. Trotter said, "The only reason we're doing it this way is because there is no way I'd be allowed to write what I really feel about it—which, ironically, is supposed to be the point of a column."

149.    Mr. Trotter's column ended up getting so "watered down" by leadership's desire to "balance" the article that it did not appropriately challenge the NFL for its lack of diversity.  Mr. Trotter was so frustrated by this process that he ended up asking the editors to "kill" the

column because it was no longer something he could stand behind or to which he was comfortable attaching his name.  Ultimately, it was decided that the column would not run.

150.    However, that was not the end of it.  Mr. Trotter felt the column needed to run because of the importance of the topic.  Within one week of the decision to "kill" the column, he reverted back to leadership, said he wanted to column to run and demanded a Zoom video conference to address his concerns with Mr. Bhanpuri and asked that Mr. Sperry join as well.  They agreed.

151.    On or about June 7, 2022, the Zoom video conference was held and Mr. Trotter expressed his belief that he was being treated disparately, unfairly and more harshly than other writers because he had expressed his belief that the NFL engages in discriminatory conduct and as part of expressing his belief had been critical of the Accelerator Program.

152.     By the end of the Zoom, after there appeared to be some level of unanimity that the article would run, Mr. Sperry suggested the timing was not right to run the story because several weeks had passed since the Accelerator Program.  As such, it was decided the column would not run.

### G.    Mr. Trotter Raises His Concerns About Systemic Discrimination and the NFL's Lack of Diversity, and His Complaints Continue to Fall on Deaf Ears

153.    In June 2022, NFL Media held its annual summit in Los Angeles to discuss the ongoing developments within the business and the upcoming NFL season.  At one point, Mr. Trotter was part of a private, small group session which was being led by Mark Quenzel.  Mr. Schroeder, from the NFL league office, was present at the session as well.

154.    Mr. Trotter asked Mr. Quenzel about the lack of Black people in key roles in the newsroom and asked when there would be a full-time Black employee on the news desk.  Mr. Quenzel responded by stating that the news desk already had a full-time Black employee.  Mr.

Trotter corrected him and said that was not true.  Mr. Quenzel replied that, "I walk through the newsroom every day.  I see them."

155.    Mr. Trotter was offended by Mr. Quenzel's use the term "them" to vaguely assert that there were Black employees in key positions in the newsroom.  Nonetheless, Mr. Trotter kept his composure and said, "I will drop the question right now if you give me the name of one such employee.  Just one."  Mr. Quenzel then backtracked and said, "I can't think of it right now. I'll get back to you."  But Mr. Quenzel never did—ever.

156.    After the summit, Mr. Trotter reported to Mr. Schroeder that he has consistently raised his concerns about the lack of Black representation in leadership positions the newsroom and that it was part of a larger pattern is discriminatory conduct throughout the NFL.  Mr. Trotter stated that he wished he did not have to continually raise these concerns, but that it is important for the NFL to live up to its public statements that diversity, equity and inclusion are core principles of the league.  Mr. Schroeder had no response.

157.    Despite having raised concerns of discrimination directly to senior leadership in NFL Media and the NFL league office, no follow up or inquiry followed.  The NFL clearly preferred to ignore Mr. Trotter's articulated complaints rather than address them.

**H.    The NFL Directs Mr. Trotter to "Stand Down" In His Reporting Critical of the NFL's Handling of the Damar Hamlin Incident**

158.    As has been widely reported, on January 2, 2023, during a nationally-televised Monday Night Football game, Damar Hamlin, a safety on the Buffalo Bills, collapsed on the field during the middle of a play.

159.    While injuries that require a stoppage of play are not infrequent in the NFL, it very quickly became apparent that the injury was potentially life threatening.  After a period of

time, the NFL decided to cancel the remainder of the game out of respect for Mr. Hamlin, his teammates and the seriousness of the situation.

160.    However, at one point before that determination had been made, the players had been warming up as Mr. Hamlin was being carted off the field, indicating that players had been told that play would resume.

161.    In the days that followed, Mr. Trotter learned that the teams were in fact instructed that play would resume after a five-minute warm-up, explaining why the players had been doing so.  This decision, Mr. Trotter and other reporters learned, came from the NFL league office not from the officials on the field.

162.    This directive was uncovered by several reporters and was widely reported in the media in the days that followed.[30]  However, the NFL staunchly denied these claims, as reflected in the various articles.  Mr. Trotter, for his part, investigated further.  He received confirmation from multiple sources refuting the NFL's version and its denial.

163.    Mr. Trotter reached out to Brian McCarthy, the NFL's Vice President of Communications, seeking comment from the NFL employee who, according to Mr. Trotter's sources, informed the teams that they would resume play.  But Mr. McCarthy simply denied the allegations and refused to make the person available to Mr. Trotter.

164.    Mr. Trotter, being a tenacious reporter, pushed further that he needed to speak to the individual or at the very least needed a comment from that person.  Mr. McCarthy responded, knowing that Mr. Trotter was not "merely" a journalist but also an NFL employee, "I will call

---

[30]    See e.g. Howe, Jeff, Kahler, Kalyn, *ESPN stands by reporting that 5-minute warmup, game resuming was discussed after Hamlin collapse*, The Athletic, (January 3, 2023), https://theathletic.com/4055040/2023/01/03/damar-hamlin-collapse-espn/; Belson, Ken, Vrentas, Jenny, *Who Told Players to Warm Up After Damar Hamlin Collapsed?* New York Times, (January 9, 2023), https://www.nytimes.com/2023/01/09/sports/football/damar-hamlin-injury-controversy.html; Layton, Jeremy, NFL denies ESPN's 'five minutes' report after Bills' Damar Hamlin collapsed on field, NY Post, (January 3, 2023).

your supervisor if you don't let this go."  Mr. Trotter responded that he was "fine with" Mr.

McCarthy calling his supervisor because he was doing his job.

165.    Soon after, Mr. Trotter received a text message from Mr. Sperry.  Mr. Sperry

directed Mr. Trotter to "stand down" in his reporting on the story.  Mr. Trotter responded, "I

thought it was our job as journalists to always pursue the truth.  Is that not the case?"  Mr. Sperry

never responded to Mr. Trotter's text message—which speaks for itself.

166.    This entire incident makes it very clear that the NFL controls NFL Media,

throttles content that is critical of the NFL and will not hesitate to silence employees who speak

out regarding matters that are unfavorable to the league.  While in this case, the matter involved

the NFL's handling of a sensitive incident involving a player injury, it was consistent with the

resistance Mr. Trotter faced when speaking up regarding discrimination.

**I.      Mr. Trotter's Numerous Other Attempts to Call out the NFL's Lack of Black
Representation in the Newsroom Are Treated as an Annoyance**

167.    In addition to the specific incidents described above, Mr. Trotter on numerous

other occasions spoke privately with his supervisors and publicly—as both a journalist and an

NFL employee—about the NFL's discriminatory conduct and failure to take appropriate

remedial actions, as well as the lack of diversity across the league and the newsroom.

168.    As mentioned above, in or around December 1, 2021, Mr. Trotter reached out to

Mr. Sperry directly to confirm his understanding that there was not a single Black full-time

employee on the news desk.

169.    While Mr. Sperry confirmed Mr. Trotter's beliefs as accurate, he also questioned

Mr. Trotter about the reason he needed the information and Mr. Trotter explained that he gets

asked about diversity in the NFL regularly.

170.    Mr. Sperry then asked Mr. Trotter to share information with him about where he would be reporting this information, clearly indicating that he did not want Mr. Trotter to speak openly regarding the lack of racial diversity.

171.    He also implored Mr. Trotter to get information about the NFL's diversity initiates from HR, clearly asking Mr. Trotter to "balance" his statements and paint the NFL in a positive light in any discussions that centered around the lack of diversity.

172.    As another such example, on January 12, 2023, the NFL held a national media conference call to speak about the upcoming hiring cycle for head coaches, knowing that this would be a hotly followed topic given the lack of black head coaches having been frequently reported on and discussed by members of the media and public alike.

173.    The call was led by Dasha Smith, the NFL's Executive Vice President and Chief Administrative Officer, and Jonathan Beane, the NFL's Chief Diversity & Inclusion Officer.

174.    Towards the end of the call, Mr. Trotter asked Ms. Smith when the NFL Media newsroom would finally have a Black manager or when the news desk would have a Black full-time employee.

175.    Ms. Smith's response was dismissive: "Yes, Jim.  You regularly make us aware of this.  Hopefully you won't have to ask any more in the next year."

176.    Thus, the NFL—in this case through Ms. Smith—was yet again expressing annoyance and frustration with Mr. Trotter's engagement in protected activity by raising complaints regarding the lack of Black employees in the workplace.

177.    Moreover, the NFL was clearly directing Mr. Trotter to stop raising this issue and attempting to deter him from raising future complaints or concerns.

## IV. THE NFL REFUSES TO EXTENDED MR. TROTTER'S CONTRACT FOR INTERNALLY AND EXTERNALLY SPEAKING OUT AGAINST AND OPPOSING DISCRIMINATION THAT PERMEATES THE NFL

178.    On or about November 16, 2022, Mr. Trotter's agent, Adisa Bakari, reached out to Sandra Nunez, NFL Vice President of On-Air Talent Management, to discuss the renewal of Mr. Trotter's contract which was set to expire on March 31, 2023.

179.    Mr. Bakari and Ms. Nunez spoke and she told him that she "could not envision any reason why his [Mr. Trotter's] contract would not be renewed."

180.    Ms. Nunez also asked Mr. Bakari whether Mr. Trotter desired any changes in his role and whether he was interested in expanding his role with NFL Media.

181.    Mr. Trotter and his agent relied on this representation and did not look for or seek alternative job opportunities in the weeks and months that followed.

182.    Mr. Trotter and Mr. Bakari expected a contract renewal to be provided sometime in late-February 2023/early-March 2023.

183.    The 2023 Super Bowl was scheduled for Sunday, February 12, 2023.

184.    During the press week leading up to the Super Bowl, Mr. Trotter ran into Ms. Nunez and they had a brief conversation to say hello.

185.    Mr. Trotter mentioned to Ms. Nunez that he planned to again ask Mr. Goodell questions regarding the lack of Black representation in managerial positions in the newsroom or on the news desk.  Ms. Nunez appeared uncomfortable, sighed and the conversation concluded.

186.    On February 8, 2023, at the State of the League press conference on the Wednesday before the Super Bowl, Mr. Trotter again stepped up to probe his employer's record on race discrimination.

187.   Mr. Trotter felt compelled to do so given that, *inter alia*, he did not receive an adequate response the previous year, he had seen absolutely no actions demonstrating a commitment to Black people in any aspect of the NFL, and he had observed numerous instances of severely discriminatory conduct by owners.  Specifically, Mr. Trotter said:

> You and other league officials have said that the league's commitment to diversity, equity and inclusion, extend beyond the sidelines and beyond the front offices, and is applied to all aspects of the company.  ***I've worked at NFL media for five years, and during those five years we've never had a black person in senior management in our newsroom***.  That's a problem because we cover a league who according to league data the player population is 60% to 70% Black, which means that there is no one who looks like these players at the table when decisions are being made about how they are covered.  More concerning is that for a year-plus now, ***we have never had a full time Black employee on the news desk***, which again is a problem because we cover a league, who's player population is 60% to 70% Black according to league data.  I asked you about these things last year and you told me that the league had fallen short and that you would review all of your policies and practices to try and improve this.  And yet, a year later, nothing has changed.  You know, James Baldwin once said that "I can't believe what you say because I see what you do."  And so, I would ask you ***as an employee***, when are we in the newsroom going to have a Black person in senior management, and when will we have a full-time Black employee on the news desk?[31]

188.   It was immediately apparent that Mr. Goodell was perturbed by Mr. Trotter's remarks.  Mr. Goodell responded as follows:

> Well Jim, I am not in charge of the newsroom, so I—I think—can I answer your question—as you point out this is the same question you asked last year. And we did go back, and we have reviewed everything we've been doing across the league.  And we are looking at everything from vendors that we're working with, to partners that we're working with, to ownership where we've seen significant changes in diversity this year.  And I'm not specifically—I don't know specifically about the media business—we'll check in again with our people, but I am comfortable that we've made significant progress across the league.  I can't answer this specific question, some of the data you may have raised there may be accurate, maybe

---

[31]   See https://twitter.com/JimTrotter_NFL/status/1623418098429591554 (emphasis added).

not.  Last year I was told some of it wasn't, we'll get to you on that.
We want to make progress across the board, and that includes in the
media room.  And so, those are things that we'll continue to look at
and hopefully make real progress to.  I can't answer because I don't
specifically know what those numbers are today.

189.    Mr. Goodell's entirely vague, superficial and canned response was indicative of

the lack of responsiveness Mr. Trotter had been dealing with throughout his tenure working at

the NFL when he raised and tried to affect change towards racial diversity and inclusion.

190.    Mr. Goodell effectively told Mr. Trotter that despite him having asked the same

question the previous year, he did not have an answer and could not identify anything that had

been done to address the lack of Black inclusion in managerial roles in the newsroom or at all

with respect to full time positions on the news desk.

191.    The next day, Mr. Bhanpuri asked a colleague, "Why does Jim [Trotter] keep

bringing this up?"

192.    Just like the year prior, no one at the NFL reached out to Mr. Trotter to discuss

the complaints he raised and no investigation of any kind was ever conducted.  This was not only

consistent with the inaction following the previous year's State of the League press conference,

but the tradition of inaction that had become standard operating procedure in the NFL.

193.    On March 1, 2023, Mr. Trotter was in attendance at the Women in Football

Forum during the NFL Scouting Combine in Indianapolis, and he crossed paths with Mr.

Goodell.  He called out to Mr. Goodell and asked if he could have a moment to talk.

194.    Mr. Goodell responded, "As an employee, you should have my email and phone

number."  Mr. Trotter explained that he had reached out to Mr. Goodell's team and tried several

times to have Mr. Goodell on his (now former) podcast without success.

195.    The next day, March 2, 2023, Ms. Nunez spotted Mr. Trotter having breakfast with Mr. Flores.  Ms. Nunez asked Mr. Trotter if they could speak later that afternoon before he departed, and he said he would be available later that afternoon and they made a plan to meet. This would be the first substantive communication Mr. Trotter had with Ms. Nunez since she had confirmed to his agent, Mr. Bakari, that his contract would be renewed.

196.    Mr. Trotter met Ms. Nunez met in the lobby of the Westin Hotel and they proceeded to look for a space that was more private than the lobby, eventually landing on a place near the skywalk, which is a connection of indoor tunnels connecting buildings in downtown Indianapolis.  Several people they knew walked by during the conversation.

197.    Mr. Trotter expected this to be a conversation about the terms of his contract renewal.  After some small talk, Ms. Nunez shifted the conversation and asked Mr. Trotter, "I wanted to talk to you about the newsroom.  Are you in alignment?"

198.    Mr. Trotter told Ms. Nunez that while he was committed to his job and journalistic integrity, "How can I be in alignment with a newsroom that does not have Black representation in decision-making positions?"

199.    Ms. Nunez responded, "Yeah, yeah, what I thought.  That's what I thought.  You know, it's tough to go against corporate headwinds.  Sometimes you have to compromise."  Ms. Nunez then proceeded to tell Mr. Trotter about times she had made compromises in her earlier in her career and explained that "Sometimes you have to compromise to pay the mortgage."

200.    Mr. Trotter said that he had "already compromised enough."

201.    Mr. Trotter stated that he compromised when he did not say anything when the NFL swept under the rug that Mr. Pegula had said "If the Black players don't like it here, they should go back to Africa and see how bad it is."

202.    Mr. Trotter said he compromised when he did not speak out about Mr. Jones' comments about Black people needing to buy their own team if they wanted equal treatment.

203.    And Mr. Trotter said that he compromised when he remained silent in response to a "stand down" order from Mr. Sperry regarding the NFL's handling of the Damar Hamlin matter.

204.    Mr. Trotter proceeded to say, "There's one thing I won't compromise on, and that's my integrity."  Mr. Trotter said that he was simply asking the NFL to live up to its publicly stated commitment to diversity, inclusion and equity.  Ms. Nunez said she understood.

205.    At this point, the conversation had gone on for some time and it was clear that Ms. Nunez's remarks were part of a continued push by the NFL to silence Mr. Trotter from further speaking out against the NFL.

206.    Mr. Trotter asked Ms. Nunez directly, "Are you now saying my contract is not being extended?"

207.    Ms. Nunez responded, "I don't know.  It's still being discussed."

208.    Having not heard from Ms. Nunez for almost two weeks thereafter, and during which time Mr. Trotter felt a strong sense that he was officially *persona non grata* at the NFL as he had not been given a single writing assignment, he reached back out to Ms. Nunez.

209.    On March 12, 2023, Mr. Trotter emailed Ms. Nunez and explained that over the last several weeks he had been the subject of retaliation based on a series of concerning events, including not being provided opportunities and being excluded from work functions as well as his concern that his contract was not going to be renewed based on their previous conversation. Mr. Trotter concluded: "There is a saying: Once is an accident, twice is a coincidence, three times is a pattern."

210.    On March 16, 2023, Ms. Nunez responded to Mr. Trotter's email and self-servingly denied any claims of retaliation.

211.    However, only eight days later, on March 24, 2023, Ms. Nunez called Mr. Trotter's agent and told him that his contract was no longer being renewed.

212.    This was a blatant act of retaliation against Mr. Trotter for his decision to raise concerns publicly and privately regarding discrimination within the NFL and in the NFL Media newsroom.

213.    Unfortunately, Mr. Trotter's termination is not a one-off or a surprise or an anomaly.  Rather, Mr. Trotter's termination is the logical and expected result of an employer that has demonstrated time and time again that it does not value diversity, does not embrace Black voices and acts with vindictiveness towards anyone who speaks negatively about the NFL or opposes the NFL's systemic discriminatory and retaliatory conduct.

## FIRST CAUSE OF ACTION
### (Discrimination under Section 1981)
*As to all Defendants*

214.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

215.    As described above, Defendants have discriminated against Plaintiff on the basis of race and/or color in violation of Section 1981 by, *inter alia*, subjecting him to disparate treatment, a hostile work environment and terminating his employment and/or refusing to extend his contract.

216.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.

217.    Plaintiff seeks all remedies available by law, including without limitation equitable relief necessary to remedy Defendants' unlawful practices and provide for a diverse and inclusive workplace where Black employees have equal opportunities to be hired, retained and advanced within the NFL.

## SECOND CAUSE OF ACTION
### (Retaliation under Section 1981)
*As to all Defendants*

218.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

219.    As described above, Defendants have retaliated against Plaintiff on the basis of his protected activities in violation of Section 1981 by, *inter alia*, subjecting him to disparate treatment, a hostile work environment and terminating his employment and/or refusing to extend his contract.

220.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy the retaliatory conduct described above.

221.    Plaintiff seeks all remedies available by law, including without limitation equitable relief necessary to remedy Defendants' unlawful practices and provide for a diverse and inclusive workplace where Black employees have equal opportunities to be hired, retained and advanced within the NFL.

## THIRD CAUSE OF ACTION
### (Discrimination under NYSHRL)
*As to all Defendants*

222.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

223.    As described above, Defendants have discriminated against Plaintiff on the basis

of race and/or color in violation of NYSHRL by, *inter alia*, subjecting him to disparate

treatment, a hostile work environment and terminating his employment and/or refusing to extend

his contract.

224.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to

prevent or remedy discriminatory conduct due to race and/or color.

225.    Plaintiff seeks all remedies available by law, including without limitation

equitable relief necessary to remedy Defendants' unlawful practices and provide for a diverse

and inclusive workplace where Black employees have equal opportunities to be hired, retained

and advanced within the NFL.

## FOURTH CAUSE OF ACTION
### (Retaliation under NYSHRL)
*As to all Defendants*

226.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous

allegation as if fully set forth herein.

227.    As described above, Defendants have retaliated against Plaintiff on the basis of

his protected activities in violation of NYSHRL by, *inter alia*, subjecting him to disparate

treatment, a hostile work environment and terminating his employment and/or refusing to extend

his contract.

228.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to

prevent or remedy the retaliatory conduct described above.

229.    Plaintiff seeks all remedies available by law, including without limitation

equitable relief necessary to remedy Defendants' unlawful practices and provide for a diverse

and inclusive workplace where Black employees have equal opportunities to be hired, retained and advanced within the NFL.

## FIFTH CAUSE OF ACTION
### (Discrimination under NYCHRL)
*As to all Defendants*

230.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

231.    As described above, Defendants have discriminated against Plaintiff on the basis of race and/or color in violation of NYCHRL by, *inter alia*, subjecting him to disparate treatment, a hostile work environment and terminating his employment and/or refusing to extend his contract.

232.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.

233.    Defendants' conduct occurred in and/or had an impact in the City of New York in that the NFL league office is located in New York City, decisions related to Mr. Trotter's employment and termination were made in New York City, Mr. Trotter worked in New York City and stayed overnight in New York City during his employment for the NFL.

234.    Plaintiff seeks all remedies available by law, including without limitation equitable relief necessary to remedy Defendants' unlawful practices and provide for a diverse and inclusive workplace where Black employees have equal opportunities to be hired, retained and advanced within the NFL.

## SIXTH CAUSE OF ACTION
### (Retaliation under NYCHRL)
*As to all Defendants*

235.    Plaintiff hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

236.    As described above, Defendants have retaliated against Plaintiff on the basis of his protected activities in violation of NYCHRL by, *inter alia*, subjecting him to disparate treatment, a hostile work environment and terminating his employment and/or refusing to extend his contract.

237.    Defendants' conduct occurred in and/or had an impact in the City of New York in that the NFL league office is located in New York City, decisions related to Mr. Trotter's employment and termination were made in New York City, Mr. Trotter worked in New York City and stayed overnight in New York City during his employment for the NFL.

238.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy the retaliatory conduct described above.

239.    Plaintiff seeks all remedies available by law, including without limitation equitable relief necessary to remedy Defendants' unlawful practices and provide for a diverse and inclusive workplace where Black employees have equal opportunities to be hired, retained and advanced within the NFL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray that the Court issue a judgment in Plaintiff's favor and issue the following additional relief:

A.    A declaratory judgment that Defendants' conduct constitutes violations of the applicable federal, state and local laws prohibiting workplace discrimination and retaliation.

B.      An award of equitable relief necessary to force the NFL to remedy and change its

discriminatory and retaliatory practices and comply with the law, including (i) the imposition of

a court-ordered monitor to review the NFL's policies and/or practices and implement necessary

changes with respect to the hiring, retention and advancement of Black people throughout all

levels of the NFL organization and hierarchy, including at NFL Media, the NFL league office

and within NFL teams, (ii) that any such court-ordered monitor conduct a full-scale investigation

into the discriminatory and/or retaliatory animus of all persons in position of power over the

NFL, including the NFL team owners, and (iii) that court-ordered monitor publicly publish a full

report of his or her investigations, findings, conclusions and recommendations.

C.      An award of damages in an amount to be determined at trial, including but not

limited to punitive damages intended to deter Defendants from continuing its well-documented

history of discriminatory and retaliatory conduct.

D.      An award covering all of Plaintiff's attorneys' fees and costs.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  September 12, 2023
        New York, New York                  Respectfully submitted,

                                            **WIGDOR LLP**

                                            By: _____
                                                  Douglas H. Wigdor
                                                  David E. Gottlieb
                                                  William O. Doheny

                                            85 Fifth Avenue
                                            New York, NY 10003
                                            Telephone: (212) 257-6800
                                            Facsimile: (212) 257-6845
                                            dwigdor@wigdorlaw.com
                                            dgottlieb@wigdorlaw.com
                                            wdoheny@wigdorlaw.com

                                            *Counsel for Plaintiff*