**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------- X

JIM TROTTER,                                            :

                      Plaintiff,      :

           v.                                  :

THE NATIONAL FOOTBALL LEAGUE; NFL      :
ENTERPRISES LLC; and NFL NETWORK           :
SERVICES, INC.,                                          :

                  Defendants.   :
--------------------------------------------------------- X

       Civil Action No.: 1:23-cv-08055

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS</u>

WIGDOR LLP

Douglas H. Wigdor
David E. Gottlieb

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
dgottlieb@wigdorlaw.com

*Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ALLEGATIONS OF THE COMPLAINT.............................................................................2

I.      Discrimination During Mr. Trotter's Employment with Defendants ................................2

II.     The *Flores* Class Action is Filed; Mr. Trotter Draws Parallels with NFL Media ..............3

III.    Mr. Trotter Raises Further Complaints of Discrimination and is Quickly Terminated........5

PROCEDURAL HISTORY...................................................................................................8

ARGUMENT ........................................................................................................................8

I.      Standard on a Motion to Dismiss .....................................................................................8

II.     Mr. Trotter Has Pleaded Retaliation Claims Under §1981, NYSHRL and NYCHRL........9

          A.      Mr. Trotter Clearly Alleged Engagement in Protected Activity............................9

          B.      Mr. Trotter Alleged Causation Between His Complaints and Termination ..........14

          C.      Mr. Trotter Has Pleaded Retaliatory Intent...........................................................17

III.    Mr. Trotter Has Properly Pleaded Hostile Work Environment Claims............................18

IV.    Mr. Trotter Has Pleaded Entitlement to Protection Under NYSHRL and NYCHRL .......20

V.     Plaintiff Can Amend to Cure Any Potential Defects .......................................................21

CONCLUSION...................................................................................................................22

**<u>TABLE OF AUTHORITIES</u>**

**<u>Cases</u>**                                                                                                                                             **<u>Page(s)</u>**

Abromavage v. Deutsche Bank Sec. Inc.,
    No. 18 Civ. 6621 (VEC), 2021 WL 1061596 (S.D.N.Y. Mar. 19, 2021) ................................ 10

Ahmad v. New York City Health & Hosps. Corp.,
    No. 20 Civ. 675 (PAE), 2021 WL 1225875 (S.D.N.Y. Mar. 31, 2021) .................................. 15

Alvarado v. Nordstrom, Inc.,
    685 F. App'x 4 (2d Cir. 2017) ............................................................................................... 17

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ................................................................................................................ 8

Bamba v. Fenton,
    758 F. App'x 8 (2d Cir. 2018) ............................................................................................... 12

Banks v. Gen. Motors, LLC,
    81 F.4th 242 (2d Cir. 2023) ................................................................................................... 15

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) ................................................................................................................ 8

Blackwell v. City of Bridgeport,
    238 F. Supp. 3d 296 (D. Conn. 2017) ................................................................................... 19

Cantley v. Indiana Univ. Health, Inc.,
    No. 13 Civ. 01296 (TWP) (MJD), 2015 WL 5692511 (S.D. Ind. Sept. 28, 2015) ................ 12

Cardwell v, DavisPolk & Wardell LLP,
    No. 19 Civ. 10256 (GHW), 2021 WL4434935 (S.D.N.Y. Sept. 23, 2021) ........................... 12

Champion v. New York State Off. of Parks, Recreation & Historic Pres.,
    500 F.Supp.3d 26 (S.D.N.Y. 2020) ......................................................................................... 9

Colon v. New York City Hous. Auth.,
    No. 16 Civ. 4540 (VSB), 2021 WL 2159758 (S.D.N.Y. May 26, 2021) ............................... 14

Cortec Indust., Inc. v. Sum Holding L.P.,
    949 F.2d 42 (2d Cir. 1991) ................................................................................................... 21

Curry-Malcolm v. Rochester City Sch. Dist.,
    No. 18 Civ. 6450 (DGL), 2024 WL 184463 (W.D.N.Y. Jan. 17, 2024) ................................ 17

Curtis v. Citibank, N.A.,
    No. 97 Civ. 1065 (DAB), 2002 WL 27780 (S.D.N.Y. Jan. 10, 2002) ................................... 20

Duplan v. City of New York,
    888 F.3d 612 (2d Cir. 2018) ................................................................... 16

E.E.O.C. v. Bloomberg L.P.,
    967 F. Supp. 2d 816 (S.D.N.Y. 2013) ................................................... 20

Flynn v. N. Y. State Div. of Parole,
    620 F. Supp. 2d 463 (S.D.N.Y. 2009) ................................................... 10

Fried v. LVI Servs., Inc.,
    No. 10 Civ. 9308 (JSR), 2011 WL 4633985 (S.D.N.Y. Oct. 4, 2011) ................... 20

Giscombe v. New York City Dep't of Educ.,
    39 F. Supp. 3d 396 (S.D.N.Y. 2014) ....................................................... 9

Gonzalez v. City of N.Y.,
    377 F. Supp. 3d 273 (S.D.N.Y. 2019) ....................................................... 9

Gordwin v. Amazon.com Inc.,
    No. 21 Civ. 00888 (PHX) (SPL), 2021 WL 5396086 (D. Ariz. Nov. 17, 2021) ..... 13

Grant v. Bethlehem Steel Corp.,
    622 F.2d 43 (2d Cir. 1980) ................................................................... 15

Grant v. Hazelett Strip-Casting Corp.,
    880 F.2d 1564 (2d Cir. 1989) ................................................................. 10

Griffith v. Metro. Transit Auth.-New York City Transit,
    No. 19 Civ. 6234 (AT), 2022 WL 16540877 (S.D.N.Y. Oct. 28, 2022) .............. 11

Harding v. Dorilton Cap. Adv. LLC,
    635 F. Supp. 3d 286 (S.D.N.Y. 2022) ..................................................... 19

Hoffman v. Parade Publications,
    15 N.Y.3d 285 (2010) ......................................................................... 20

Kassman v. KPMG LLP,
    925 F.Supp.2d 453 (S.D.N.Y. 2013) ......................................................... 9

Kekovic v. Titan Motor Grp. LLC,
    No. 22 Civ. 2142 (MKB), 2023 WL 6385712 (E.D.N.Y. Sept. 29, 2023) ............. 9

Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.,
    716 F.3d 10 (2d Cir. 2013) ................................................................... 12

Lax v. City Univ. of New York,
    No. 20 Civ. 3906, 2022 WL 103315 (2d Cir. Jan. 11, 2022) ......................... 19

Littlejohn v. City of New York,
   795 F.3d 297 (2d Cir. 2015) ................................................................. 8, 18

Lyte v. S. Cent. Connecticut Reg'l Water Auth.,
   482 F. Supp. 2d 252 (D. Conn. 2007) ..................................................... 13

Mandala v. NTT Data, Inc.,
   975 F.3d 202 (2d Cir. 2020) ................................................................... 12

Marcus v. Leviton Mfg. Co.,
   661 F. App'x 29 (2d Cir. 2016) .............................................................. 18

Martinez v. N.Y.C. Dep't of Educ.,
   No. 04 Civ. 2728 (LTS) (DFE), 2008 WL 2220638 (S.D.N.Y. May 27, 2008) ..................... 10

Meyenhofer v. Larsen & Toubro Infotech Ltd.,
   503 F. Supp. 3d 39 (S.D.N.Y. 2020) .......................................................11

Moazzaz v. Metlife, Inc.,
   No. 19 Civ. 10531 (JPO), 2021 WL 827648 (S.D.N.Y. Mar. 4, 2021) ................... 12

Moccio v. Cornell Univ.,
   889 F. Supp. 2d 539 (S.D.N.Y. 2012) ..................................................... 10

Pedroza v. Ralph Lauren Corp.,
   No. 19 Civ. 08639 (ER), 2020 WL 4273988 (S.D.N.Y. July 24, 2020) ................ 21

Ronzani v. Sanofi S.A.,
   899 F.2d 195 (2d Cir. 1990) ................................................................... 21

Small v. New York City Dep't of Educ.,
   650 F. Supp. 3d 89 (S.D.N.Y. 2023) ...................................................... 14

Soto v. Marist Coll.,
   No. 17 Civ. 7976 (KMK), 2019 WL 2371713 (S.D.N.Y. June 5, 2019) ................ 13

Sumner v. U.S. Postal Serv.,
   899 F.2d 203 (2d Cir. 1990) ..................................................................... 9

Torres v. Pisano,
   116 F.3d 625 (2d Cir. 1997) ................................................................... 19

Trachtenberg v. Dep't of Educ. of City of New York,
   937 F. Supp. 2d 460 (S.D.N.Y. 2013) ....................................................... 8

Trujillo v. City of New York,
   No. 14 Civ. 8501 (PGG), 2016 WL 10703308 (S.D.N.Y. Mar. 29, 2016) ............. 16

Wheeler v. Praxair Surface Techs., Inc.,
    No. 21 Civ. 1165 (PAE), 2023 WL 6282903 (S.D.N.Y. Sept. 26, 2023) ............................... 18

Whidbee v. Garzarelli Food Specialties, Inc.,
    223 F.3d 62 (2d Cir. 2000) ........................................................................................... 12

White v. Automatic Data Processing, Inc.,
    No. 22 Civ. 04800 (JLR), 2023 WL 3222397 (S.D.N.Y. May 3, 2023) ................................... 9

Wilson v. New York & Presbyterian Hosp.,
    No.17 Civ. 5012 (RRM) (CLP), 2021 WL 9493971 (E.D.N.Y. June 22, 2021) ..................... 12

Wimmer v. Suffolk Cnty. Police Dep't,
    176 F.3d 125 (2d Cir. 1999) ........................................................................................... 14

Witcher v. New York City Dep't of Educ.,
    No. 21 Civ. 7750 (PGG) (SN), 2023 WL 2609342 (S.D.N.Y. Mar. 23, 2023) ..................... 15

Zann Kwan v. Andalex Grp. LLC,
    737 F.3d 834 (2d Cir. 2013) ........................................................................................... 17

Zoulas v. New York City Dep't of Educ.,
    400 F. Supp. 3d 25 (S.D.N.Y. 2019) ............................................................................... 18

Statutes

42 U.S.C. §1981 ................................................................................................... 9, 17, 18

N.Y. Exec. L. §290 ............................................................................................... 9, 18, 20

N.Y. Admin. Code ............................................................................................... 9, 18, 20

Rules

Fed. R. Civ. P. 15(a)(2) ............................................................................................... 21

Plaintiff Jim Trotter ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendants National Football League ("NFL"), NFL Enterprises LLC and NFL Network Services Inc.'s (together, "NFL Media") Motion to Dismiss the Complaint.

## PRELIMINARY STATEMENT

Defendants' motion is more notable for what it ignores than what it states. Defendants largely ignore the fact that the Complaint alleges that Mr. Trotter engaged in three specific instances of clearly protected activity that each occurred two months, three weeks and 12 days, respectively, before his termination. Defendants largely ignore these specific protected complaints because the Complaint alleges that Mr. Trotter expressly raised the fact that the NFL failed to hire or promote a Black person into a leadership position in NFL Media or a full-time position on the NFL Media news desk—an allegation Defendants also ignore. Defendants largely ignore that Mr. Trotter raised these examples of discrimination in context where he drew an express parallel between his experiences in NFL Media to the employment discrimination claims asserted in Flores v. National Football League, No. 22 Civ. 00871 (VEC) ("Flores Class Action"). Defendants largely ignore that, in these protected complaints, Mr. Trotter gave examples of discriminatory slurs used by NFL team owners—which Mr. Trotter alleged were part of management of his employer (an allegation also ignored)—about Black players. Defendants also largely ignore that just prior to these protected complaints, Defendants told Mr. Trotter that his employment contract would be renewed and his role could even be enhanced— offers which vanished after Mr. Trotter protested the NFL's record of discrimination. Defendants are asking the Court to ignore the well-pleaded factual allegations and adopt their own self-serving characterizations, essentially giving employers cover to fire employees who complain about discrimination. Respectfully, Defendants' motion should be swiftly denied.

## <u>ALLEGATIONS OF THE COMPLAINT</u>

### I.   <u>Discrimination During Mr. Trotter's Employment with Defendants</u>

In March 2018, already with a resume that made him one of the most accomplished football journalists in the world, Mr. Trotter entered into a two-year contract with the NFL that ran through the end of March 2020.  <u>See</u> Dkt. No. 1 (Complaint) at ¶¶92-94.  At the end of his initial contract, Mr. Trotter's contract was renewed to run through March 31, 2023, with further renewal contemplated thereafter.  <u>Id.</u> at ¶95.

During Mr. Trotter's tenure, he observed a dearth of Black representation in the NFL newsroom; specifically, there were no Black managers and no Black full-time employees on the news desk.  <u>Id.</u> at ¶¶8, 96, 98, 101, 154.  Mr. Trotter viewed the lack of racial diversity in NFL newsroom management and on the NFL news desk to be part of the well-documented pattern of systemic and institutional race discrimination which permeated the NFL, and which the NFL and its owners have refused to address for decades and generations.  <u>Id.</u> at ¶102.

The systemic racial discrimination Mr. Trotter was aware of included, but was not limited to, both public and widely documented racially discriminatory conduct by the NFL (his employer) towards players and coaches (employees), but also private discriminatory conduct Mr. Trotter directly observed.  <u>Id.</u> at ¶¶23-79, 110-177.  Certain examples follow:

- The NFL has an extensive history of employment discrimination towards players, including Black players being barred from entry and subjected to egregious racial discrimination by team owners.  <u>Id.</u> at ¶¶23-28.

- The NFL and its team owners discriminated against and blackballed Colin Kaepernick for protesting racial discrimination in society at large.  <u>Id.</u> at ¶¶29-34.

- Highly offensive racial slurs have been used by seemingly respected NFL insiders, such as Jon Gruden, in communications with members of NFL team management.  <u>Id.</u> at ¶¶35-41.

- NFL teams have engaged in employment discrimination in the failure to hire or retain Black employees into head coach and other leadership-level positions, despite a rule literally forcing teams to interview minority candidates.  Id. at ¶¶49-54, 62-68.

- NFL team owner Jerry Jones offensively stated to Mr. Trotter about the lack of diversity in team leadership: "If Blacks feel some kind of way, they should buy their own team and hire who they want to hire."  Id. at ¶¶110-124.

- NFL team owner Terry Pegula was reported to have made an offensive and racist statement to an NFL employee and Black players (employees) who were protesting racial discrimination: "If the Black players don't like it here, they should go back to Africa and see how bad it is."  Id. at ¶¶125-133.

Mr. Trotter repeatedly attempted to call the NFL out for discriminatory conduct within the NFL but was met with nothing but resistance and roadblocks.  For instance, after raising Jerry Jones's discriminatory statements, Mr. Trotter was directly told by management not to speak openly about those racist remarks and no investigation into that conduct ever followed.  Id. at ¶¶120-124.  As another example, Mr. Trotter raised complaints about Terry Pegula's racist conduct, but the complaints were swept under the rug.  Id. at ¶¶129-133.

## II.    The *Flores* Class Action is Filed; Mr. Trotter Draws Parallels with NFL Media

On February 1, 2022, former Dolphins Head Coach and current Vikings Defensive Coordinator Brian Flores filed the Flores Class Action, a race discrimination class action lawsuit alleging, *inter alia*, that the NFL and its team owners engage in systemic employment discrimination (whether intentional or in its disparate impact) towards Black Head Coaches and candidates with respect to hiring, retention and advancement.  Id. at ¶134.  The NFL's response to the Flores Class Action was to state within just a few hours of its filing and without conducting any investigation that the claims were "without merit."  Id.  This response was consistent with the NFL's unwillingness to meaningfully address these issues for years, including specifically with respect to the matters raised by Mr. Trotter.  Id. at ¶140.

Days later, on February 9, 2022, NFL Commissioner Roger Goodell held a press conference, in which the <u>Flores</u> Class Action and the issues raised therein were a hot topic.  <u>Id.</u> at ¶135.  Mr. Trotter directly addressed Mr. Goodell (the chief executive of his employer)— expressly stating that he was speaking as an employee of the NFL (i.e. "as a member of the Media group" and "where I work")—about his concerns with respect to race discrimination within the NFL.  <u>Id.</u> at ¶¶136-137.  Mr. Trotter made clear reference to the employment discrimination claims set forth in the <u>Flores</u> Class Action,[1] describing the NFL's discrimination against Black Head Coaches and General Managers.  <u>Id.</u>  Mr. Trotter then clearly drew a parallel between the discrimination issues raised in the <u>Flores</u> Class Action and what he observed within NFL Media (the NFL's media arm), raising complaints about a lack of Black employees and the NFL's failures with "hiring Black people into decision making positions."  <u>Id.</u>  Mr. Goodell responded by acknowledging that the NFL needed to "do a better job" and the league needed to "become more effective in our policies and procedures."  <u>Id.</u> at ¶138.  Mr. Goodell assured Mr. Trotter that he would look into these matters and they would be addressed.  <u>Id.</u>

Over the course of the next year, Mr. Trotter raised similar concerns with his supervisors that "the lack of Black representation in leadership positions [in] the newsroom [] was part of a larger pattern [of] discriminatory conduct throughout the NFL."  <u>See</u> <u>e.g.</u> <u>id.</u> at ¶¶151, 153-156.  At the end of the NFL's 2022-2023 football season, when the next Head Coach hiring cycle was soon set to begin, an NFL senior executive held a conference call with reporters in which there

---

[1]       In fact, Mr. Trotter's statement to Mr. Goodell expressly referenced Mr. Goodell's "initial statement" from the beginning of the press conference before taking questions from the reporter pool.  <u>See</u> <u>id.</u> at ¶136.  While not quoted in the Complaint, Mr. Goodell's initial statement at the press conference was largely about the <u>Flores</u> Class Action, the NFL's response to allegations about discriminatory hiring policies and practices and providing "equal opportunity" to Black candidates.  <u>Id.</u> at n.28 (<u>https://www.nfl.com/videos/roger-goodell-s-super-bowl-lvi-news-</u><u>conference</u> at 1:06-4:51).  Even in the reporter questions that followed, a substantial portion of the discussion at the press conference was related to the allegations in the <u>Flores</u> Class Action and the NFL's response.  Thus, Mr. Trotter's reference to that initial statement makes clear that his challenges to Mr. Goodell were made in this context of allegations of employment discrimination within the NFL.

was discussion about the race discrimination issues raised by the <u>Flores</u> Class Action.  <u>Id.</u> at

¶¶172-177.  During this call, Mr. Trotter again raised the parallels between the discrimination in

hiring Head Coaches with the discrimination in failure to hire Black employees and managers in

NFL Media.  <u>Id.</u>  But, despite having raised these and other discrimination concerns directly to

NFL senior leadership, no investigation or inquiry followed.  <u>Id.</u>

### III.   <u>Mr. Trotter Raises Further Complaints of Discrimination and is Quickly Terminated</u>

On or about November 16, 2022, Mr. Trotter's agent, Adisa Bakari, reached out to Sandra

Nunez (NFL Vice President of On-Air Talent Management), to discuss the renewal of Mr.

Trotter's contract which was set to expire on March 31, 2023.  <u>Id.</u> at ¶178.  Ms. Nunez told him

that she "could not envision any reason why his [Mr. Trotter's] contract would not be renewed"

and even asked if Mr. Trotter "was interested in expanding his role."  <u>Id.</u> at ¶179.  Mr. Trotter and

his agent relied on this representation and did not look for or seek alternative job opportunities in

the weeks and months that followed.  <u>Id.</u> at ¶181.  Mr. Trotter and Mr. Bakari expected a contract

renewal to be provided sometime in late-February 2023/early-March 2023 consistent with past

practices.  <u>Id.</u> at ¶182.

On February 8, 2023, Mr. Goodell held his annual pre-Super Bowl press conference,

which again involved significant discussion regarding the <u>Flores</u> Class Action and the

employment discrimination issues raised therein.  <u>Id.</u> at ¶185-186.  Mr. Trotter again stepped up

to probe his employer's record on race discrimination given the lack of movement or changes on

the issues he had raised in the year that had passed.  <u>Id.</u> at ¶187.  Specifically, Mr. Trotter said:

> You and other league officials have said that the league's
> commitment to diversity, equity and inclusion, extend beyond the
> sidelines and beyond the front offices, and is applied to all aspects
> of the company.  ***<u>I've worked at NFL media for five years, and
> during those five years we've never had a black person in senior
> management in our newsroom</u>***.  That's a problem because we cover

a league who according to league data the player population is 60% to 70% Black, which means that there is no one who looks like these players at the table when decisions are being made about how they are covered.  More concerning is that for a year-plus now, ***we have never had a full time Black employee on the news desk***, which again is a problem because we cover a league, who's player population is 60% to 70% Black according to league data.  I asked you about these things last year and you told me that the league had fallen short and that you would review all of your policies and practices to try and improve this.  And yet, a year later, nothing has changed.  You know, James Baldwin once said that "I can't believe what you say because I see what you do."  And so, I would ask you ***as an employee***, when are we in the newsroom going to have a Black person in senior management, and ***when will we have a full-time Black employee on the news desk***?

Id.  Mr. Goodell provided a vague, superficial and canned response, which was indicative of the lack of responsiveness Mr. Trotter had been dealing with throughout his tenure working at the NFL when he raised issues related to discrimination.  Id. at ¶188.

A few weeks later, March 2, 2023, Ms. Nunez spotted Mr. Trotter having breakfast with Mr. Flores—the lead plaintiff in the Flores Class Action—and asked Mr. Trotter if they could speak later that afternoon.  Id. at ¶195.  This would be the first substantive communication Mr. Trotter had with Ms. Nunez since she had confirmed to his agent, Mr. Bakari, that his contract would be renewed.  Id.

Mr. Trotter expected this to be a conversation about the terms of his contract renewal.  Id. at ¶197.  After some small talk, Ms. Nunez shifted the conversation and asked Mr. Trotter, "I wanted to talk to you about the newsroom.  Are you in alignment?"  Id.  Mr. Trotter told Ms. Nunez that while he was committed to his job and journalistic integrity, "How can I be in alignment with a newsroom that does not have Black representation in decision-making positions?"  Id. at ¶198.  Ms. Nunez responded, "Yeah, yeah, what I thought.  That's what I thought.  You know, it's tough to go against corporate headwinds.  Sometimes you have to

6

compromise." <u>Id.</u> at ¶199.  Ms. Nunez then proceeded to tell Mr. Trotter about times she had made compromises earlier in her career and explained that "Sometimes you have to compromise to pay the mortgage." <u>Id.</u>

Mr. Trotter said that he had "already compromised enough." <u>Id.</u> at ¶200.  Mr. Trotter stated that he compromised when he did not say anything when the NFL swept under the rug that Mr. Pegula had said "If the Black players don't like it here, they should go back to Africa and see how bad it is." <u>Id.</u> at ¶201.  Mr. Trotter said he compromised when he did not speak out about Mr. Jones's comments about Black people needing to buy their own team if they wanted equal treatment.  <u>Id.</u> at ¶202.  Mr. Trotter proceeded to say, "There's one thing I won't compromise on, and that's my integrity."  Mr. Trotter said that he was simply asking the NFL to live up to its publicly stated commitment to diversity, inclusion and equity.  <u>Id.</u> at ¶204.  Mr. Trotter then asked Ms. Nunez directly, "Are you now saying my contract is not being extended?" <u>Id.</u> at ¶¶205-206.  Ms. Nunez responded, "I don't know.  It's still being discussed." <u>Id.</u> at ¶207.

Mr. Trotter then started to notice blatant retaliation against him.  On March 12, 2023, Mr. Trotter emailed Ms. Nunez and explained that over the last several weeks he had been the subject of retaliation based on a series of concerning events, including not being provided opportunities and being excluded from work functions as well as his concern that his contract was not going to be renewed based on their previous conversation.  <u>Id.</u> at ¶¶208-209.  Mr. Trotter concluded: "There is a saying: Once is an accident, twice is a coincidence, three times is a pattern." <u>Id.</u>  On March 16, 2023, Ms. Nunez responded to Mr. Trotter's email and self-servingly denied any claims of retaliation.  <u>Id.</u> at ¶210.

Only eight days later, on March 24, 2023, Ms. Nunez told Mr. Trotter's agent that his contract was no longer being renewed, effectively terminating his employment.  <u>Id.</u> at ¶211.

## PROCEDURAL HISTORY

On September 12, 2023, Plaintiff filed this action.  Dkt. No. 1.  Shortly thereafter,

Plaintiff dual filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") and the California Department of Fair Employment & Housing

("DFEH"), administrative prerequisites to asserting discrimination claims under Title VII of the

Civil Rights Act of 1964 ("Title VII") and California state law, respectively.  Id. at ¶13.  Upon

the conclusion of the administrative processes, Plaintiff will amend his Complaint to assert

claims under Title VII and California state law.  On January 26, 2023, Defendants moved to

dismiss this action.  Dkt. No. 27.  Plaintiff herein opposes that motion.

## ARGUMENT

### I.    Standard on a Motion to Dismiss

On a motion to dismiss for failure to state a claim, "all factual allegations in the

complaint are accepted as true and all inferences are drawn in the plaintiff's favor."  Littlejohn v.

City of New York, 795 F.3d 297, 307 (2d Cir. 2015).  The complaint need only "contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

a court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Iqbal, 556 U.S. at 678.  In an employment discrimination action, at the pleading stage, there is no

obligation to satisfy the components of a *prima facie* case.  See e.g. Trachtenberg v. Dep't of

Educ. of City of New York, 937 F. Supp. 2d 460, 465 (S.D.N.Y. 2013) (in ADEA context, but

stating the concept generally to employment discrimination actions).  To the extent applicable at

all, the *prima facie* case elements simply help "provide an outline of what is necessary to render

a plaintiff's employment discrimination claims for relief plausible."  Kassman v. KPMG LLP, 925 F.Supp.2d 453, 461 (S.D.N.Y. 2013).

**II.** **Mr. Trotter Has Pleaded Retaliation Claims Under §1981, NYSHRL and NYCHRL**

The pleading requirements for a retaliation claim under §1981, NYSHRL and NYCHRL are simple.  A plaintiff need only plausibly allege "a 'causal link' between the protected activity and the retaliatory act."  White v. Automatic Data Processing, Inc., No. 22 Civ. 04800 (JLR), 2023 WL 3222397, at *4 (S.D.N.Y. May 3, 2023); Gonzalez v. City of N.Y., 377 F. Supp. 3d 273, 301 (S.D.N.Y. 2019).  Here, Mr. Trotter alleges that despite being told that he was on track for a contract extension and an advancement in his role, he was terminated only weeks after he raised discrimination (and then retaliation) complaints to Mr. Goodell and Ms. Nunez.  See supra at pp. 2-8.  Respectfully, these allegations are more than sufficient under all existing law.

**A.** **Mr. Trotter Clearly Alleged Engagement in Protected Activity**

Defendants exert significant energy attempting to contort the facts and the law to characterize Mr. Trotter's complaints as somehow failing to constitute "protected activity."  See Defs.' Br. at pp. 10-14.  In effect, Defendants argue that even if everything Mr. Trotter alleges is true, the NFL was *permitted* under the law to terminate Mr. Trotter for raising those complaints.

The standard for protected activity is generally stated as being any conduct that "opposes statutorily discriminatory conduct."  See e.g. Giscombe v. New York City Dep't of Educ., 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014).  However, as per the Second Circuit, the standard is very broad and includes "informal protests of discriminatory employment practices, *including [] protesting against discrimination by industry or by society in general*."  Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (emphasis added); Champion v. New York State Off. of Parks, Recreation & Historic Pres., 500 F.Supp.3d 26, 49 (S.D.N.Y. 2020) (same); Kekovic v.

Titan Motor Grp. LLC, No. 22 Civ. 2142 (MKB), 2023 WL 6385712, at *8 (E.D.N.Y. Sept. 29, 2023) (same).

Furthermore, complaints about unlawful retaliation also constitute protected activity.  See e.g. Abromavage v. Deutsche Bank Sec. Inc., No. 18 Civ. 6621 (VEC), 2021 WL 1061596, at *4 (S.D.N.Y. Mar. 19, 2021) (citing Moccio v. Cornell Univ., 889 F. Supp. 2d 539, 588 (S.D.N.Y. 2012) (retaliation complaint is protected activity); Flynn v. N. Y. State Div. of Parole, 620 F. Supp. 2d 463, 489 (S.D.N.Y. 2009) (citing Martinez v. N.Y.C. Dep't of Educ., No. 04 Civ. 2728 (LTS) (DFE), 2008 WL 2220638, at *11 (S.D.N.Y. May 27, 2008) (recognizing that complaints of retaliation constituted protected activity).

A plaintiff need not ultimately prove the merit of his underlying discrimination complaint, only that he was plausibly acting under a good faith, reasonable belief that a violation existed.  See e.g. Grant v. Hazelett Strip–Casting Corp., 880 F.2d 1564, 1569 (2d Cir. 1989).

Mr. Trotter's allegations make it clear—and certainly "plausible," as is the standard— that he engaged in protected activity.  Mr. Trotter engaged in numerous complaints about racially discriminatory employment practices within the NFL, including (i) complaints about owners making racist and discriminatory remarks about players/employees (Dkt. No. 1 at ¶¶120-124, 129-133, 197-204), (ii) complaints about the NFL's history of employment discrimination towards Black coaches and executives (id. at ¶¶136, 187), (iii) complaints related to the employment discrimination claims in the Flores Class Action (id. at ¶¶134-136, 151), (iv) complaints about systemic discrimination within the NFL (id. at ¶¶136, 187), (v) complaints about the NFL's discriminatory failure to hire a Black manager in NFL Media (id. at ¶¶136, 166-177, 187), (vi) complaints about the NFL's failure to hire full-time Black employees on the NFL Media new desk (id. at ¶¶136, 187, 166-177), and (vii) complaints about retaliation for raising

the above-referenced concerns (id. at ¶¶197-204).  In close temporal succession to Mr. Trotter's

final series of complaints (in February and March 2023), the NFL terminated Mr. Trotter's

employment—an abrupt and stark change from previous representations that his employment

would continue and even grow.  Id. at ¶¶178-182.  These allegations are more than sufficient.

Defendants are wrong that Mr. Trotter's complaints are not "protected activity" because

they claim he raised generalized complaints about a lack of diversity.  See Defs.' Br. at pp. 10-

14.  This argument completely mischaracterizes the allegations of the Complaint in an attempt to

align with inapposite case law.  As set forth, Mr. Trotter clearly raised complaints that, on their

face, directly implicated discriminatory employment practices, including but not limited to a

discriminatory failure to hire (both with respect to coaches and employees in NFL Media).  Id. at

¶¶136, 166-177, 187.  Moreover, several of Mr. Trotter's complaints—including in particular his

complaints to Mr. Goodell in February 2022 and February 2023—drew a direct parallel between

his experiences and observations in NFL Media with the employment discrimination allegations

in the Flores Class Action, further demonstrating that he was opposing employment

discrimination.  Id. at ¶¶136, 187.  Moreover, Mr. Trotter's complaints expressly reference

offensive racial slurs in the workplace by management and about employees.  Id. at ¶¶120-124,

129-133, 197-204.

Mr. Trotter's complaints all plausibly involve and/or implicate statutorily prohibited

conduct, including discriminatory failure to hire, discriminatory failure to promote,

discriminatory hostile work environment and discriminatory impact.  See e.g. Meyenhofer v.

Larsen & Toubro Infotech Ltd., 503 F. Supp. 3d 39, 48 (S.D.N.Y. 2020) (discriminatory failure to

hire actionable); Griffith v. Metro. Transit Auth.-New York City Transit, No. 19 Civ. 6234 (AT),

2022 WL 16540877, at *2 (S.D.N.Y. Oct. 28, 2022) (discriminatory failure to promote

actionable); <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 69 (2d Cir. 2000) (hostile

work environment actionable); <u>Mandala v. NTT Data, Inc.</u>, 975 F.3d 202, 208 (2d Cir. 2020)

(disparate impact claims actionable).

Given the facts alleged, Defendants' attempt to characterize Mr. Trotter's complaint as

merely one about a generalized lack of diversity or general racism is way off the mark, as is

Defendants' case law.  <u>See</u> Defs.' Br, at pp. 12-13 (citing <u>Moazzaz v. Metlife, Inc.</u>, No. 19 Civ.

10531 (JPO), 2021 WL 827648, at *13 (S.D.N.Y. Mar. 4, 2021) (bare complaints about "lack of

diversity" with no context to support inference of statutorily discriminatory conduct being part of

the complaint); <u>Bamba v. Fenton</u>, 758 F. App'x 8 (2d Cir. 2018)[2] (*pro se* plaintiff's

discrimination claims dismissed on summary judgment where there were no facts to support bare

claim that he was "discriminated and defamed"); <u>Kelly v. Howard I. Shapiro & Assocs.</u>

<u>Consulting Engineers, P.C.</u>, 716 F.3d 10, 14 (2d Cir. 2013) (rejecting claim of paramour

preference where there were no facts to demonstrate discrimination on the basis of gender);

<u>Wilson v. New York & Presbyterian Hosp.</u>, No. 17 Civ. 5012 (RRM) (CLP), 2021 WL 9493971,

at *12 (E.D.N.Y. June 22, 2021) (granting summary judgment on retaliation claim where

predicate complaints limited to "harassment" and being "set up to fail" without any

discriminatory basis).[3]

In fact, although Plaintiff does not rely strictly on this argument herein, several courts

have even found that complaints about a lack of diversity in the workplace are, in fact, "protected

activity" under the law.  <u>See</u> <u>e.g.</u> <u>Cantley v. Indiana Univ. Health, Inc.</u>, No. 13 Civ. 01296

---

[2]     Although the case is of no significance to the matter at bar, Defendants failed to cite that <u>Bamba</u> was a Summary Order which does not have precedential effect.
[3]     It is the height of irony that Defendants cite <u>Cardwell v. Davis Polk & Wardell LLP</u>, No. 19 Civ. 10256 (GHW), 2021 WL 4434935, at *31 (S.D.N.Y. Sept. 23, 2021) for the proposition that it would have a "perverse effect" if general complaints about diversity, equity and inclusion were protected.  Although those are not the facts or allegations of this matter, it would be utterly perverse if a judicial rule were established giving employers a green light to fire employees who engage in the protected activity described in Mr. Trotter's Complaint.

(TWP) (MJD), 2015 WL 5692511, at *9 (S.D. Ind. Sept. 28, 2015) (denying summary judgment where complaint was limited to "comments about a lack of diversity in leadership and Black females in entry level positions" because "the inference can be made that Ms. Cantley complained to Ms. Riley about discriminatory hiring practices and such complaint was a protected activity."); Gordwin v. Amazon.com Inc., No. 21 Civ. 00888 (PHX) (SPL), 2021 WL 5396086, at *7 (D. Ariz. Nov. 17, 2021) ("Plaintiff first plausibly engaged in protected activity in January 2020 when she voiced concerns about the lack of diversity in certain senior leadership roles"); see also Lyte v. S. Cent. Connecticut Reg'l Water Auth., 482 F. Supp. 2d 252, 269 (D. Conn. 2007) (protected complaint included that plaintiff "spoke to managers . . . about the lack of diversity . . . and the need to advance diversity issues"); Soto v. Marist Coll., No. 17 Civ. 7976 (KMK), 2019 WL 2371713, at *10 (S.D.N.Y. June 5, 2019) (stating that plaintiff "was arguably 'protesting against discrimination industry or by society in general' by discussing the lack of diversity at Marist with his class.").

Defendants are also incorrect that the Court should somehow disregard Mr. Trotter's complaints about Jerry Jones and Terry Pegula engaging in discriminatory conduct because "opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." See Defs.' Br. at pp. 13-14.[4] Defendants posit that Mr. Trotter has failed to allege that Jerry Jones and Terry Pegula were his employer and therefore those complaints did not implicate employment practices. This argument demonstrates a complete failure to even read the allegations of the Complaint.

---

[4]    Although, even excluding these complaints, Mr. Trotter still clearly engaged in protected activity for the reasons described above.

Mr. Trotter expressly—and correctly—alleged that Jerry Jones and Terry Pegula, as team owners, were his "employer."[5]  To wit, Mr. Trotter expressly alleged that "The NFL Team Owners, the NFL and NFL Media are a Single Enterprise."  Dkt. No. 1 at ¶¶80-91.  Mr. Trotter alleged that NFL Media is simply an arm of the NFL, which is run, operated and controlled in all regards by NFL team owners.  Id. at ¶¶80-84.  Mr. Trotter expressly alleged that, "while Mr. Trotter's direct employer was technically NFL Media, his true operational and functional employer was at all times the NFL and the team owners who control all aspects of the NFL."  Id. at ¶91.  Mr. Trotter referred to the team owners as his "employer" throughout the Complaint.  See e.g. id. at ¶¶4, 105, 132.  In fact, Mr. Trotter provided a graphic allegation showing the NFL's hierarchy and reporting structure from the owners down to Mr. Trotter.  Id. at ¶25.  Defendants did not even address these allegations in falsely arguing that Mr. Trotter did not allege that the team owners are his employer.[6]

## B.    Mr. Trotter Alleged Causation Between His Complaints and Termination

Defendants are incorrect that Mr. Trotter has failed to plead causation between his protected activity and his termination.  In citing Colon v. New York City Hous. Auth., No. 16 Civ. 4540 (VSB), 2021 WL 2159758, at *13 (S.D.N.Y. May 26, 2021), Defendants state that a plaintiff can "establish a causal connection to support a retaliation claim "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who

---

[5]       We suspect, having engaged in motion practice with the NFL in the Flores Class Action, that Defendants will spring its arguments as to why these allegations are insufficient in their reply papers, in an attempt to preclude Plaintiff from responding to those arguments.  If so, Plaintiff reserves his right to seek leave to file a sur-reply.

[6]       Even if Jerry Jones and Terry Pegula were not Mr. Trotter's "employer," Mr. Trotter's complaints regarding them are still directly related to employment discrimination within the NFL and not remarks about mere "private individuals."  For this reason, Defendants' cited cases are completely off the mark.  See Small v. New York City Dep't of Educ., 650 F. Supp. 3d 89, 103 (S.D.N.Y. 2023) (complaints about harassment towards a student not protected); Wimmer v. Suffolk Cnty. Police Dep't, 176 F.3d 125, 134 (2d Cir. 1999) (on summary judgment, finding complaints about mistreatment of non-employee citizens not protected).

engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." See Defs.' Br. at p. 14.  However, as Defendants are well aware, Colon provided that standard at the *summary judgment* stage.

At the *pleading* stage, a plaintiff need only plausibly allege causation, which can often be met by temporal proximity alone.  See e.g. Witcher v. New York City Dep't of Educ., No. 21 Civ. 7750 (PGG) (SN), 2023 WL 2609342, at *14 (S.D.N.Y. Mar. 23, 2023) ("Although temporal proximity alone will not be enough to support [plaintiff's] claim on summary judgment, it is sufficient at the pleading stage."); Ahmad v. New York City Health & Hosps. Corp., No. 20 Civ. 675 (PAE), 2021 WL 1225875, at *27 (S.D.N.Y. Mar. 31, 2021) (same).

Even looking only at Mr. Trotter's termination (and not the retaliation which preceded termination), the time period at issue—two months, three weeks or 12 days,[7] depending on the protected complaint (¶¶187, 197-204, 209)—is easily short enough to support an inference of retaliation for purposes of a motion to dismiss.  See e.g. Banks v. Gen. Motors, LLC, 81 F.4th 242, 278 (2d Cir. 2023) (citing additional Second Circuit cases) ("***six months*** . . . between [] filing [a] complaint" and an adverse action "fits within the range of time that we have held can support a reasonable inference of causation.") (emphasis added); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (holding that "***eight months*** between . . . [a] complaint and retaliatory action suggested a causal relationship.") (emphasis added).

However, Mr. Trotter will ultimately—at summary judgment and trial—rely not merely on temporal proximity.  Mr. Trotter will also show, as he alleged, that Defendants made an abrupt 180-degree change in treatment after he engaged in protected conduct—given that shortly before his protected complaints he was told his contract would be renewed and his role at NFL

---

[7]    For reasons only Defendants can explain, Defendants characterize these complaints as occurring "within nine months" of Mr. Trotter's termination.  See Defs.' Br. at pp. 15.

Media enhanced.  Dkt. No. 1 at ¶¶178-182.  Mr. Trotter will show, as he alleged, that he was

retaliated against even before his termination in the weeks that followed his February 8, 2023

complaint to Mr. Goodell and March 2, 2023 complaint to Ms. Nunez, which is reflective of

retaliatory animus.  Id. at ¶209.  Mr. Trotter will show, also as alleged, that there were several

direct comments to him by senior NFL executives reflecting clear dissatisfaction that Mr. Trotter

had raised previous complaints, further reflective of retaliatory animus.  Id. at ¶¶175-176, 191,

197-207.  In fact, the actual video footage of Mr. Goodell's response to Mr. Trotter's February 8,

2023 complaints reflects that he was flustered and annoyed by Mr. Trotter's decision to raise his

concerns a second time.  Id. at ¶188.[8]  Finally, as set forth in the Complaint, Mr. Trotter will

show that the NFL has a record of engaging in retaliation towards those who raise discrimination

complaints, and has a documented penchant to silence, bully and intimidate those who allege

discriminatory conduct.  See e.g. ¶¶1, 3, 29-34, 213.[9]  Thus, Mr. Trotter will be able to show

both general institutional retaliatory animus and specific retaliatory animus towards him.  See

e.g. Duplan v. City of New York, 888 F.3d 612, 625 (2d Cir. 2018) ("Causation may be shown

by direct evidence of retaliatory animus or inferred through temporal proximity to the protected

activity").

It defies logic and undermines the anti-retaliation laws to argue—as Defendants do—that

it is implausible to infer that Defendants retaliated against Mr. Trotter in 2023 because he had

made a similar complaint in 2022.  Defendants' cited case for this proposition has no bearing on

this issue whatsoever.  See Defs.' Br at p. 15 (citing Trujillo v. City of New York, No. 14 Civ.

8501 (PGG), 2016 WL 10703308, at *17 (S.D.N.Y. Mar. 29, 2016) (confirming that "several

---

[8]      While Plaintiff did not embed any video footage into the Complaint, a link to the footage in question was
included in a footnote.  See id. at n. 31.
[9]      The Flores Class Action also alleges retaliation against Mr. Flores for filing the lawsuit.  See Flores v.
NFL, No. 22 Civ. 00871 (VEC) at Dkt. No. 22 (Amended Complaint) at ¶¶ 207-218.

months" is sufficient temporal proximity at pleading stage)).   Taking Defendants' position to its logical conclusion, an employer would *never* have to face a retaliation claim if at some prior point in the past the employee engaged in protected conduct and was not fired.   Put another way, Defendants' proposed rule would mean any employee who is not promptly retaliated against in response to one complaint forever loses anti-retaliation protection for future complaints.   See e.g. Curry-Malcolm v. Rochester City Sch. Dist., No. 18 Civ. 6450 (DGL), 2024 WL 184463, at *4 (W.D.N.Y. Jan. 17, 2024) ("It is beyond cavil that plaintiff's pursuit of multiple administrative charges is a protected activity").

That is not the law.   Regardless, the Complaint makes clear that Defendants did, in fact, show displeasure with Mr. Trotter about the fact that he had raised previous complaints of discrimination.   Dkt. No. 1 at ¶¶175-176.   Moreover, the circumstances were different when Mr. Trotter made his previous complaints—in February 2022, Mr. Trotter was under contract for another year and Defendants would have been unable to let his contract expire without renewal. Id. at ¶95.   Furthermore, as alleged, Defendants' patience with Mr. Trotter's complaints wore out over time, which was not the case when he challenged Mr. Goodell initially in 2022.   Thus, Mr. Trotter's allegations of causation are more than plausible.

### C.     Mr. Trotter Has Pleaded Retaliatory Intent

Under NYCHRL, a plaintiff need only plead retaliation played "some role" or was a "motivating factor," whereas under Section 1981, a plaintiff must plead it was the "but for" cause of an adverse action.   See e.g. Alvarado v. Nordstrom, Inc., 685 F. App'x 4, 9 (2d Cir. 2017) (summary order).   However, even "'but-for' causation does not require proof that retaliation was the "only" cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."   Zann Kwan v. Andalex Grp. LLC, 737 F.3d

834, 846, n.5 (2d Cir. 2013) ("a plaintiff's injury can have multiple 'but—for' causes, each one of which may be sufficient to support liability").  Thus, at the pleading stage, a plaintiff need only plausibly allege facts from which it can be inferred that retaliation would not have occurred absent protected activity.  Marcus v. Leviton Mfg. Co., 661 F. App'x 29, 32 (2d Cir. 2016) (summary order) ("To plausibly allege that retaliation was a but-for cause of adverse action, a plaintiff 'must plead facts that give plausible support to a minimal inference of the requisite discriminatory causality.'"); Zoulas v. New York City Dep't of Educ., 400 F. Supp. 3d 25, 52–53 (S.D.N.Y. 2019) ("the Court follows the 'minimal inference' standard described in *Littlejohn*, and does not require the Plaintiff to plead 'but-for' causation").  For all the reasons set forth above, Plaintiff has more than satisfied any and all such pleading standards.

### III.   **Mr. Trotter Has Properly Pleaded Hostile Work Environment Claims**[10]

Under Section 1981, NYSHRL and NYCHRL, a plaintiff can assert a claim of hostile work environment on the basis of race and/or color.  "To establish a hostile work environment under Section 1981, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015).  However, to establish a hostile work environment under NYSHRL and NYCHRL, a plaintiff need only establish "less well" treatment.  See e.g. Wheeler v. Praxair Surface Techs., Inc., No. 21 Civ. 1165 (PAE), 2023 WL 6282903, at *13 (S.D.N.Y. Sept. 26, 2023)

Plaintiff alleges that the work environment at the NFL included all the conduct about which Mr. Trotter raised protected complaints—failure to hire and promote Black employees,

---

[10]    For clarity, Mr. Trotter does not assert a claim of racially discriminatory termination.  Mr. Trotter's discrimination claims—as opposed to his retaliation claims—are limited to hostile work environment.

discriminatory and offensive slurs by NFL team owners, directives not to speak about racially discriminatory conduct by team owners, repeated failures by the NFL to take action in response to complaints of racial discrimination by Mr. Trotter and a broad lack of racial diversity in the NFL and NFL Media.  See supra at pp. 2-7.  The racially hostile work environment was further bolstered by Mr. Trotter's knowledge that the NFL had a history rich with race discrimination, (see Dkt. No. 1 at ¶¶23-67) and that complaints of race discrimination by others fell on deaf ears and led to retaliation and snap judgments that such complaints were baseless.  See supra at pp. id. at ¶¶29-34, 62-67, 134.  The NFL's repeated refusal to investigate or address Mr. Trotter's discrimination complaints demonstrated an acceptance of and acquiescence to that conduct, and an organization that was uncaring, unwilling or unable to handle race discrimination complaints. Id. at ¶10.

These allegations are sufficient, particularly at the pleading stage, to show that Defendants condoned and ratified a racially hostile workplace—and the allegations are not, as Defendants argue, limited to isolated discriminatory remarks.  See e.g. Harding v. Dorilton Cap. Adv. LLC, 635 F. Supp. 3d 286, 301 (S.D.N.Y. 2022) ("hostile work environment [claim] involves a question of fact and is generally inappropriate to determine at the pleadings stage of a litigation."); Blackwell v. City of Bridgeport, 238 F. Supp. 3d 296, 309 (D. Conn. 2017) (failure to investigate and remedy discrimination complaints may contribute to a hostile work environment because "an employer's attitude, manifested through its actions and inactions, constitutes part of the work environment.");[11] Torres v. Pisano, 116 F.3d 625, 636 (2d Cir. 1997) ("The law is clear that an employer may not stand by and allow an employee to be subjected to a

---

[11] There is a line of cases that says a failure to investigate does not "by itself" constitute a hostile work environment.  See e.g. Lax v. City Univ. of New York, No. 20 Civ. 3906, 2022 WL 103315, at *2 (2d Cir. Jan. 11, 2022) (a "failure to investigate does not by itself alter the terms and conditions of employment") (emphasis added). Based on the allegations herein, those cases are distinguishable.

course of racial harassment by co-workers or supervisors") (citations omitted); <u>Curtis v. Citibank, N.A.</u>, No. 97 Civ. 1065 (DAB), 2002 WL 27780, at *3, n. 6 (S.D.N.Y. Jan. 10, 2002) ("an employer may be held liable for its failure to investigate and prevent the existence of a hostile work environment").

## IV. <u>Mr. Trotter Has Pleaded Entitlement to Protection Under NYSHRL and NYCHRL</u>

Notwithstanding that Mr. Trotter resides in California, he has properly pleaded that the conduct set forth in the Complaint has and/or had an "impact" in New York pursuant to <u>Hoffman v. Parade Publications</u>, 15 N.Y.3d 285 (2010).  As set forth in the Complaint, Defendants' headquarters are based in New York, the unlawful decision to terminate Mr. Trotter's employment was made in New York and Mr. Trotter's work for the NFL occasionally took him to New York City.  Dkt. No. 1 at ¶¶233, 237.  Moreover, Mr. Trotter's employment contract states that his employment was at all times governed by New York law and any disputes would be resolved in New York courts.

In isolation, the fact that a discriminatory decision was made in New York, the independent fact that a defendant is based in New York or the independent fact that an employee occasionally works in New York will generally be insufficient under the impact test.  However, even those analyses are typically conducted at summary judgment.  <u>See</u> <u>e.g.</u> Defs.' Br. at pp. 23-24 (citing <u>E.E.O.C. v. Bloomberg L.P.</u>, 967 F. Supp. 2d 816 (S.D.N.Y. 2013) (defendants' cited case, decided on summary judgment); <u>Fried v. LVI Servs., Inc.</u>, No. 10 Civ. 9308 (JSR), 2011 WL 4633985, at *14 (S.D.N.Y. Oct. 4, 2011), <u>aff'd</u>, 500 F. App'x 39 (2d Cir. 2012) (same, on summary judgment)).

Nonetheless, these facts all taken together at the pleading stage, coupled with the fact that Defendants themselves intended to and contractually agreed to the application of New York law

and New York venue with respect to Mr. Trotter's employment claims, creates a plausible inference of impact in New York State and City at the pleading stage.  Defendants' citation to Pedroza v. Ralph Lauren Corp., No. 19 Civ. 08639 (ER), 2020 WL 4273988, at *3 (S.D.N.Y. July 24, 2020) is inapposite.  In Pedroza, the choice of law provision was contained within a severance agreement, not the employment agreement like in the matter at bar which at all times governed the terms and conditions of Mr. Trotter's employment.

**V.**     **Plaintiff Can Amend to Cure Any Potential Defects**

Although Plaintiff firmly contends that he has adequately pleaded all his claims, any potential deficiencies can easily be addressed through an amended pleading.  To the extent the Court finds any potential deficiencies, Plaintiff respectfully requests leave to address any such concerns.  See e.g. Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990) ("[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."); Cortec Indust., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("usual practice upon granting a motion to dismiss [is to] allow leave to replead"); see also FRCP 15(a)(2) ("The court should freely grant leave [to amend] when justice so requires.").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants'

motion to dismiss and grant Plaintiff such other and further relief deemed just and proper.

Dated:  March 1, 2024
      New York, New York                         Respectfully submitted,

                                               **WIGDOR LLP**

                                             By: _____

                                                Douglas H. Wigdor
                                                David E. Gottlieb

                                           85 Fifth Avenue
                                         New York, NY 10003
                                         Telephone: (212) 257-6800
                                         Facsimile: (212) 257-6845
                                         dwigdor@wigdorlaw.com
                                         dgottlieb@wigdorlaw.com

                                         *Counsel for Plaintiff*

22