UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------
|JIM TROTTER,               |
|                           |
|     Plaintiff,            |
|                           |
|     -v-                   |
|                           |
|THE NATIONAL FOOTBALL LEAGUE;|
|NFL ENTERPRISES LLC; AND NFL|
|NETWORK SERVICES, INC.,    |
|                           |
|     Defendants.          |
----------------------------
```

23-cv-8055 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.:

This is an employment discrimination suit brought against the National Football League ("NFL") and its subsidiaries by former NFL reporter Jim Trotter. Trotter alleges that his contract with the NFL was not renewed in retaliation for Trotter's critical reporting on the NFL's track record with race. Trotter also alleges that he was subjected to a hostile work environment while at the NFL. The defendants have moved to dismiss the complaint in its entirety. After full briefing and oral argument, the Court granted in part and denied in part defendants' motion to dismiss by "bottom-line" Order dated May 29, 2024. This Opinion states the reasons for those rulings.

The sufficiency of Trotter's retaliation claim turns on whether he has adequately alleged that he engaged in some protected activity. The NFL argues that Trotter has not because his underlying complaints simply identified a lack of diversity within certain groups at the NFL coaches and executives, rather than affirmatively accused the NFL of an unlawful employment practice. The Court disagrees and finds Trotter

has successfully plead a claim for retaliation. While certain of Trotter's remarks did not expressly reference racial discrimination, other remarks of his did. Taken as a whole, Trotter has alleged that the NFL was on notice that he was complaining about an unlawful employment practice of racial discrimination at certain levels. And while the NFL claims Trotter's complaints were not sufficiently specific in identifying the unlawful employment practice he challenged, the Court finds that such specificity is not required for his complaints to still constitute protected activity. Accordingly, the Court denied defendants' motion to dismiss plaintiff's retaliation claim.

The Court agrees with the defendants, however, that Trotter has failed to allege a hostile work environment claim, because the complaint contains no facts from which it can be inferred that Trotter was subjected to a hostile environment that was objectively severe or pervasive. Similarly, the Court agrees with the NFL that Trotter's claims under New York law must be dismissed, because Trotter has failed to allege that the impact of any discriminatory conduct was felt in New York. Accordingly, in the bottom-line Order the Court granted defendants' motion to dismiss plaintiff's hostile work environment and New York state law claims.

## I.  **Factual Allegations**

The following allegations in Trotter's complaint are taken as true for purposes of the instant motions.

The NFL is a trade association comprised of 32 professional football teams with its principal place of business in New York City. Compl. ¶ 19. The NFL is the sole owner and operator of co-defendants NFL Enterprises LLC and NFL Network Services, Inc. (collectively referred to as "NFL Media"). *Id.* ¶¶ 19-22. According to the complaint, NFL Media is "nothing more than an arm of the NFL" and "all of its content, messaging and programing are controlled through the NFL league office which is controlled by the team owners." *Id.* ¶ 84.

Plaintiff Jim Trotter is an award-winning sports journalist and black male. *Id.* ¶¶ 1, 18, 68-69. Plaintiff was hired as a columnist and reporter for NFL Media in March 2018. *Id.* ¶¶ 92-95. His contract was initially set to run for a two-year term, but his contract was extended in 2020 to run through March 2023. *Id.* When Trotter was hired, he was given assurances that he would be allowed to focus his reporting on player activism and social issues impacting the NFL, including racial justice. *Id.* ¶¶ 93-94. The complaint alleges that, throughout his time at the NFL, Trotter reported on issues relating to race. *See id.* ¶¶ 92-109.

As described in the complaint, tension between Trotter and the NFL began in August 2020. At that time, Trotter allegedly asked Dallas Cowboys owner Jerry Jones about the lack of Black decisionmakers on many teams in the NFL. *Id.* ¶¶ 113-14. After initially evading the question, Jones allegedly told Trotter, "If Blacks feel some kind of way, they should buy their own team and hire who they want to hire." *Id.* ¶ 116. Trotter does not allege that he immediately lodged a

complaint about this remark with his employer. Rather, he apparently waited until October 2021, when Trotter was preparing for a TV appearance concerning race issues in the NFL. During that preparation, Trotter informed his supervisor that Trotter intended to recount this story with Jones during his upcoming TV appearance, but Trotter's supervisor told him he should not report the remark. *Id.* ¶¶ 110-12, 118-24.

A similar incident allegedly occurred in September 2020. During an internal meeting, an NFL Media reporter (not Trotter) allegedly heard Buffalo Bills owner Terry Pegula make a racist remark. In discussing racial activism, Pegula reportedly said, "If the Black players don't like it here, they should go back to Africa and see how bad it is." *Id.* ¶¶ 125-127. Trotter heard about Pegula's remark secondhand from the reporter who was present. The complaint alleges that Trotter complained to his supervisors about Pegula's remark and was told NFL's human resources department was conducting an investigation. *Id.* ¶¶ 128-129. The complaint alleges that no one ever followed up with Trotter about this remark, and the NFL did not take any action. *Id.* ¶¶ 130-133.

In February 2022, a pre-Super Bowl press conference was held with NFL Commissioner Roger Goodell. At the press conference, Goodell discussed, among other things, a class action that had just been filed against the NFL by the Dolphins' former head coach and the Vikings' defensive coordinator, Brian Flores (the "*Flores* class action") alleging the NFL engaged in employment discrimination against Black

head coach candidates. *Id.* ¶¶ 134-35. During the press conference, Trotter questioned Goodell about the lack of diversity in the NFL, stating as follows:

> The question is more for the owners, but also for you. But, since they're not here, I'll ask you, as I always say. In your initial statement, in the League's initial statement, it said that diversity, equity, and inclusion were core principles of the NFL. And I need to provide some context before I ask you about that statement.
>
> In the 100+ year history of this league, 24 of 32 franchises have either had one Black head coach, or no Black head coaches. And to make sure I get the names right, I'll read them off here. We've got: The Bills, The Commanders, The Cowboys, The Falcons, The Giants, The Jaguars, The Panthers, The Patriots, The Rams, the Ravens, The Saints, The Seahawks, The Titans, who have never had a Black head coach. That's nearly half the league. When you look at the fact that there's never been a majority Black owner, there's been one Black Club President, we look at the GMs now we're up to seven, five of those were hired in the last 12 months. We're now at three Black head coaches, two of them were hired after Brian Flores filed his lawsuit.
>
> So, it's easy to focus on the owners here, but I want to put this to you here: **when we look at the league office of the top 11 executives there, there are only two people of color. When we look at NFL Media group where I work, there is not one Black person at the senior level in the newsroom who makes decisions about a league whose player population is 70% Black. So as a member of the media group, and as a Black man, I ask, why does the NFL and its owners have such a difficult time at the highest levels hiring Black people into decision making positions?**

*Id.* ¶ 136-37 (emphasis in complaint). In response to Trotter's question, Goodell acknowledged the NFL needed to "do a better job," "find better solutions," and "find more effective policies." *Id.* ¶

138. Nonetheless, the complaint alleges "the NFL ignored the remarks and acted as though Mr. Trotter's beliefs were "'without merit' without conducting any further inquiry." *Id.* ¶ 140. Elsewhere in the complaint, plaintiff alleges there are no Black senior managers at NFL Media and no Black full-time employees on the NFL's news desk. *Id.* at ¶¶ 8, 96, 98, 101, 154.

Trotter's vocal criticism of the NFL's track record on race continued in the following months. In June 2022, Trotter drafted a column that criticized an NFL program intended to promote diversity amongst coaching staff, which was called called the "NFL Coach and Front Office Accelerator Program." *Id.* ¶¶ 141-143, 146. Upon reviewing the draft column, Trotter's supervisor pushed back against its critique of the NFL's efforts and told Trotter the article needed to be more "balanced." *Id.* ¶ 147. On a Zoom call with Trotter's supervisor and his supervisor's immediate superior regarding the column, Trotter "expressed his belief that he was being treated disparately, unfairly and more harshly than other writers because he had expressed his belief the NFL engages in discriminatory conduct." *Id.* ¶ 151. In the same month, Trotter allegedly told Hans Schroeder, COO of NFL Media, "that he has consistently raised his concerns about the lack of Black representation in leadership positions the [sic] newsroom and that it was part of a larger pattern is [sic] discriminatory conduct throughout the NFL." *Id.* ¶ 156.

In January 2023, during a national media conference call regarding diversity in coaching, Trotter asked Dasha Smith, the NFL's Executive

Vice President and Chief Administrative Officer, when the NFL Media newsroom would finally have a Black manager or when the news desk would have a Black full-time employee. *Id.* ¶¶ 172-74. Smith responded, "Yes, Jim. You regularly make us aware of this. Hopefully you won't have to ask any more in the next year." *Id.* ¶ 175.

On February 8, 2023, Goodell was again interviewed by Trotter at a pre-Super Bowl press conference. Following up on his question from the prior year, Trotter made the following remark to Goodell:

> You and other league officials have said that the league's commitment to diversity, equity and inclusion, extend beyond the sidelines and beyond the front offices, and is applied to all aspects of the company. **I've worked at NFL media for five years, and during those five years we've never had a black person in senior management in our newsroom.** That's a problem because we cover a league who according to league data the player population is 60% to 70% Black, which means that there is no one who looks like these players at the table when decisions are being made about how they are covered. More concerning is that for a year-plus now, **we have never had a full time Black employee on the news desk,** which again is a problem because we cover a league, who's player population is 60% to 70% Black according to league data. I asked you about these things last year and you told me that the league had fallen short and that you would review all of your policies and practices to try and improve this. And yet, a year later, nothing has changed. You know, James Baldwin once said that "I can't believe what you say because I see what you do." And so, **I would ask you as an employee,** when are we in the newsroom going to have a Black person in senior management, and when will we have a full-time Black employee on the news desk?

*Id.* ¶ 187 (emphasis added by plaintiff). Goodell was "perturbed" by Trotter's question and responded largely by equivocating. *Id.* ¶ 188.

Trotter's contract with NFL Media was scheduled to be renewed in March 2023. Prior to the February 2023 press conference, in November 2022, Trotter's agent had been told by Sandra Nunez, NFL Vice President of On-Air Talent Management, that she "could not envision any reason why [Trotter's] contract would not be renewed" and that Trotter's role might even be expanded. *Id.* ¶¶ 178-80. However, on March 2, 2023, Nunez and Trotter had a discussion during which Nunez asked whether Trotter was "in alignment" with the newsroom. *Id.* ¶ 197. Trotter responded by asking, "How can I be in alignment with a newsroom that does not have Black representation in decision-making positions?" *Id.* ¶ 198. Nunez then said, "Yeah, yeah, what I thought. That's what I thought. You know, it's tough to go against corporate headwinds. Sometimes you have to compromise," and explained how Nunez had compromised earlier in her career. *Id.* ¶ 199. Trotter told Nunez he had "already compromised enough," referencing the inappropriate comments by Pegula and Jones, and explaining he would not compromise on his "integrity" and was "simply asking the NFL to live up to its publicly stated commitment to diversity, inclusion and equity." *Id.* ¶¶ 200-204. At the end of the conversation, Trotter asked Nunez whether his contract was being extended and Nunez responded "I don't know. It's still being discussed." *Id.* ¶¶ 206-207.

After this conversation, on March 12, 2023, Trotter emailed Nunez and "explained that over the last several weeks he had been the subject of retaliation based on a series of concerning events, including not being provided opportunities and being excluded from work functions."

*Id.* ¶ 209. Nunez responded by denying any retaliation occurred. *Id.* ¶ 210.

Finally, on March 24, 2023, Nunez informed Trotter's agent that Trotter's contract was not being renewed and the instant suit followed. *Id.* ¶ 211.

## II.  <u>Discussion</u>

In his complaint, Trotter brings claims for (i) retaliation in violation of 42 U.S.C. § 1981 ("Section 1981"), (ii) hostile work environment in violation of Section 1981, (iii) retaliation and hostile work environment in violation of the New York City Human Rights Law ("NYCHRL"), and (iv) retaliation and hostile work environment in violation of the New York State Human Rights Law ("NYSHRL"). Defendants have moved to dismiss the complaint in its entirety. Each claim is discussed in turn.

### A. <u>Section 1981 Retaliation Claim</u>

To bring a Section 1981 retaliation claim, which is analyzed under the same principles as a Title VII retaliation claim, plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315–16 (2d Cir. 2015) (internal quotation marks omitted).

Here, defendants argue that plaintiff has failed to adequately allege the first, second and fourth elements.[1]

### 1. <u>Elements One & Two - Protected Activity & Knowledge</u>

The first element of a retaliation claim requires that the plaintiff have engaged in some protected activity. Protected activity includes any opposition to an employment practice "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the [anti-discrimination] law[s].'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)(quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir.2001)). "[T]he employment practices opposed by the plaintiff need not have actually amounted to a violation of" the anti-discrimination laws, so long as the employee had the requisite good faith, reasonable belief it was a violation. *McMenemy*, 241 F.3d at 285 (internal quotation marks omitted). Protected activity includes not only the filing of formal charges of discrimination, but also "informal protests of discrimination, including complaints to management." *La Grande v. DeCrescente Distrib. Co., Inc.*, 370 F. App'x 206, 212 (2d Cir. 2010).

---

[1]    While defendants frame certain of their arguments as going to the first element -- in particular the contention that the NFL, as his employer, could not reasonably "have understood [Trotter's] complaints" as challenging unlawful discrimination, Defs. Mot. (Dkt. 27) at 11 -- they are better understood as challenges to the second element, as explained further below.

The second element of a retaliation claim is closely related to the first. It requires that the defendant-employer have had knowledge of the protected activity. "Implicit in [this element] . . . is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by" the anti-discrimination laws. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Whereas the first element focuses on what the employee reasonably understood and believed, the second element focuses on whether the employee's complaints "put the defendant on notice that [the] complaints were about . . . discrimination, not just general unsatisfactory or unfair conduct." *Moore v. Hadestown Broadway Ltd.*, 2024 WL 989843, at *6 (S.D.N.Y. Mar. 7, 2024) (internal quotation marks omitted).

Here, the principal protected activity alleged by Trotter is a series of complaints about lack of diversity and discrimination that he made to NFL management between February 2022 and February 2023. The parties focus on comments made by Trotter to NFL Commissioner Goodell during two press conferences in February 2022 and February 2023. While not the focus of the parties' briefing, the complaint also recounts incidents in June 2022 and January 2023 where Trotter complained of discrimination in comments that also may have constituted protected activity. Defendants offer three arguments as to why none of these complaints constituted protected activity.

*First*, defendants point out that the NFL encouraged Trotter to report on race-related issues and suggest his comments to Goodell in

February 2022 and February 2023 cannot constitute protected activity because they were made while Trotter was acting in his role as a reporter. The Supreme Court has made clear, however, that "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication *virtually always* constitutes the employee's *opposition* to the activity," and hence is protected. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (internal quotation marks omitted). Applying this precedent in the *Littlejohn* case, the Second Circuit held that an HR professional "whose job responsibilities involve investigating complaints of discrimination" engages in protected activity when she "actively support[s] other employees in asserting their Title VII rights or personally complain[s] or is critical about the discriminatory employment practices of her employer," "regardless of whether she made these complaints in her capacity as" an HR professional. *Littlejohn*, 795 F.3d at 318 (internal quotation marks omitted).[2] Defendants' first argument is plainly

---

[2]     *Littlejohn* expressly rejected several district court opinions that "held that 'a supervisor's involvement, as part of his routine job duties, in reporting or investigating incidents of harassment between employees under his supervision does not qualify as protected activity.'" *Id.* at 317 (quoting *Sarkis v. Ollie's Bargain Outlet*, 2013 WL 1289411, at *13 (W.D.N.Y. Mar. 26, 2013)). *Littlejohn* also declined to adopt the so-called "manager rule," employed by other circuits in analogous contexts, which posits that "complaints of discrimination within the scope of a manager's job duties are not protected activities." *Id.* at 317 n.16.

inconsistent with *Littlejohn*. Just as an HR professional's accusations of discrimination are protected even if investigating those accusations is part of his or her job responsibilities, so too are a news reporter's accusations of discrimination made as part of his reporting duties.

*Second*, defendants argue that Trotter's February 2022 and February 2023 complaints to Goodell simply identify a "general lack of diversity in the NFL newsroom," which they argue cannot constitute protected activity because Trotter "was not 'complaining of conduct prohibited by [anti-discrimination statutes] or that [his] employers could have understood [his] complaints in this way.'" Defs. Mot (Dkt. 27) at 11 (quoting *Kelly*, 716 F.3d at 16).

Defendants are correct that only complaints about conduct that is at least arguably prohibited by the employment discrimination laws can qualify as protected activity. *See Kelly*, 716 F.3d at 14.[3] Applying this rule, the Second Circuit has held that complaints about a lack of diversity in an organization, without any suggestion that lack of

---

[3]    This requirement follows from the text of Title VII itself, which defines retaliation as taking adverse action against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). While the Second Circuit has said, and the parties here agree, that retaliation claims under Section 1981 are analyzed under Title VII principles, *see Littlejohn*, 795 F.3d at 315, Section 1981 does not contain a similar textual requirement that the activity oppose "an unlawful employment practice," and so there is reason to wonder whether such a requirement should be enforced in a similarly strict manner under Section 1981. Nevertheless, the Court assumes, for purposes of this motion, that the standard under the two statutes is identical.

diversity is attributable to discriminatory conduct, are not protected activity, because an employer is not required to engage in affirmative action efforts. *See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (concluding "complaints . . . that [defendant] was not pursuing affirmative action goals in [its] selection process" were not protected activity because "Title VII states that affirmative action in employment practices is not required by Title VII"); *see also Moazzaz v. Metlife*, 2021 WL 827648, at *13 (S.D.N.Y. Mar. 4, 2021) (concluding presentation prepared by plaintiff that "exposed many major gaps in diversity" at the defendant-company and comments by plaintiff that the company lacked a "recruiting strategy aimed at increasing diversity" were not protected activity because "lack of diversity alone is not actionable, and anti-discrimination laws do not require employers to maintain diversity programs"). Therefore, insofar as Trotter's remarks were simply advocating for greater affirmative action on the part of the NFL, without any suggestion of discrimination, the remarks do not constitute protected activity.[4]

---

[4]    There is a conflicting line of precedent, cited by plaintiff, that suggests protected activity includes "informal protests of discriminatory employment practices, including . . . protesting against discrimination by industry or by society in general." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). If "protesting against discrimination by industry or by society in general" really were sufficient to qualify as protected activity in every instance, that would likely be the end of the matter. However, the Court finds this is not an accurate statement of the law.

The statement comes from *Sumner v. U.S. Postal Service*, but the protected activity element was not disputed in that case because the

Trotter disputes the NFL's characterization of his remarks to Goodell in February 2022 and February 2023 as simply complaints about a "general lack of diversity," and instead claims his complaints "directly implicated discriminatory employment practices," including a discriminatory failure to hire, discriminatory failure to promote, and unlawful disparate impact. Pls. Opp. (Dkt. 28) at 10-11.

The Court has no difficulty concluding that Trotter had a "good faith, reasonable belief" that he was opposing conduct that violated the law, thereby satisfying the first element of the test. *Kelly*, 716 F.3d at 14. The complaint plausibly alleges Trotter genuinely held the belief that the NFL was engaged in discriminatory conduct, a belief which was supported by ample circumstantial evidence, including the complete absence of Black managers or news desk personnel at NFL Media,

---

plaintiff had filed a formal EEO complaint alleging racial discrimination. *Id.* at 206-07. While subsequent decisions have quoted this language from *Sumner*, most decisions cited by plaintiff do not actually apply its logic in the absence of some (potentially) unlawful employment practice of the defendant. *See, e.g.*, *Champion v. New York State Off. Of Parks, Recreation & Historic Pres.*, 500 F. Supp. 3d 26, 49 (S.D.N.Y. 2020); *Kekovic v. Titan Motor Grp. LLC*, 2023 WL 6385712, at *8 (E.D.N.Y. Sept. 29, 2023). One case did apparently find complaints "about lack of diversity" to be protected activity, although it reached this conclusion without much analysis since the plaintiff there also leveled other explicit accusations of race discrimination by the employer. *See Lyte v. S. Cent. Connecticut Reg'l Water Auth.*, 482 F. Supp. 2d 252, 268-69 (D. Conn. 2007). Given the binding Second Circuit precedent discussed above, the Court finds that complaints about a lack of diversity are not protected activity unless they are directed at some (potentially) unlawful employment practice, rather than simply a protest against societal discrimination generally or a lack of greater affirmative action efforts.

the fact that this dearth of Black representation was actually irrational because the player population NFL Media is reporting on is 60% to 70% Black, the fact the NFL had been accused of racism in the hiring of Black coaches in the *Flores* class action, and the fact that the NFL had failed to improve despite Trotter's repeated complaints and Goodell's commitment to take steps to do so.[5] Whether or not these facts would be sufficient to state a claim for discrimination, they are sufficient to support a reasonable, good faith belief by Trotter that discrimination was occurring, particularly when judged on a motion to dismiss where every reasonable inference must be drawn in plaintiff's favor.

The fact that Trotter had a good faith, reasonable belief that the NFL was engaged in discriminatory conduct is not enough, however, if Trotter did not adequately convey that belief to defendants. *See Galdieri-Ambrosini*, 136 F.3d at 292. More precisely, to satisfy the second element of his retaliation claim, Trotter must also show that his statements "could reasonably have [been] understood" by defendants as "opposition . . . directed at conduct prohibited by" the anti-

---

[5]   While it is true that "racial imbalance in the makeup of a workplace is insufficient, by itself, to demonstrate discrimination," *Branch v. Sony Music Ent. Inc.*, 2001 WL 228108, at *6 (S.D.N.Y. Mar. 8, 2001), *aff'd*, 34 F. App'x 23 (2d Cir. 2002), the total absence of minority representation is certainly strong circumstantial evidence of a practice of discrimination in hiring, which is obviously actionable, *see Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39, 48 (S.D.N.Y. 2020) (acknowledging viability of discriminatory failure to hire claim).

discrimination laws. *Kelly*, 716 F.3d at 15 (internal quotation marks omitted).

At no point during either the February 2022 or February 2023 press conference did Trotter ever use the word "discrimination" or directly state that the lack of diversity at NFL Media was unlawful. Instead, both statements referenced the NFL's commitments to "diversity, equity, and inclusion," which arguably suggests Trotter was simply advocating for the NFL to fulfill its prior commitments to affirmative action. On this reading, Trotter's comments would not be protected activity. *See Manoharan*, 842 F.2d at 594 (stating that "an employer's failure to follow its own voluntary affirmative action program cannot, by itself, constitute an unlawful employment practice" and concluding complaints about such failures were not protected activity). Further, while the fact Trotter made these remarks in his capacity as a reporter is certainly not dispositive, it nonetheless is a fact that is relevant to how his remarks would have been reasonably understood by his employer.

On the other hand, "an employee is not required to mention discrimination or use particular language" in order for a complaint to qualify as protected activity. *Moore*, 2024 WL 989843, at *13 (internal quotation marks omitted). Trotter's February 2022 and February 2023 comments were both disapproving, identifying a complete lack of diversity at senior leadership roles in NFL Media. Moreover, in these comments, Trotter made clear he was not simply asking his questions as a reporter, but rather "as a member of the media group,

"as a Black man," and "as an employee." Compl. ¶¶ 136, 187. Plaintiff also points out that his first remark "drew a direct parallel between his experiences and observations in NFL Media with the employment discrimination allegations in the *Flores* Class Action," which he argues demonstrates he was "opposing employment discrimination." Pls. Opp. (Dkt. 28) at 11.

Goodell's response to Trotter's remarks is also significant. In 2022, Trotter confronted Goodell with statistics about a lack of diversity at the NFL, followed by the question, "why does the NFL and its owners have such a difficult time at the highest levels hiring Black people into decision making positions?" Compl. (Dkt. 1) ¶ 136. Goodell responded by discussing the need to "become more effective in our policies and our procedures." *Id.* ¶ 138. This suggests that Goodell understood Trotter's comment as complaining about NFL policies that may have a disparate impact on minority employees and applicants, thereby constituting an unlawful employment practice. *See Farah v. Emirates & Emirates Severance Plan*, 2024 WL 1374762, at *6 (S.D.N.Y. Mar. 31, 2024) ("A prima facie case for disparate impact discrimination under Title VII must: (1) identify the specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." (internal quotation marks omitted)). While Goodell's response could also be understood as referring to policies and procedures surrounding affirmative action

efforts, at this stage the Court must credit the alternative and plausible understanding urged by Trotter.[6]

It may be true that if Trotter's February 2022 and February 2023 complaints were the only protected activity plaintiff identified, the Court might have some difficulty in concluding his allegations were sufficient to state a claim. However, plaintiff's allegations recount three other complaints by Trotter that occurred between these two incidents that make clear defendants were on notice Trotter was engaging in protected activity.

During a call in June 2022 with two of Trotter's immediate supervisors -- discussing an article Trotter had written that criticized NFL's diversity initiatives -- Trotter allegedly "expressed his belief that he was being treated disparately, unfairly and more harshly than other writers because he had expressed his belief that the NFL **engages in discriminatory conduct** and as part of expressing his belief had been critical of the Accelerator Program." Compl. ¶ 151 (emphasis added). Later that same month, at an NFL Media leadership summit, Trotter allegedly told Hans Schroeder, COO of NFL Media, "that [Trotter] has consistently raised his concerns about the lack of Black representation in leadership positions the [sic] newsroom and that it was part of a larger pattern is [sic] **discriminatory conduct** throughout

---

[6]   In Trotter's 2023 remarks, Trotter expressly referred back to this promise to "review all of [the league's] policies and practices to try and improve this," which would similarly appear to constitute protected activity. Compl. (Dkt. 1) ¶ 187.

the NFL." *Id.* ¶ 156 (emphasis added). Finally, Trotter again raised internal complaints about a lack of diversity in January 2023 (although he did not reference discrimination this time), to which Dasha Smith, the NFL's Executive Vice President and Chief Administrative Officer, responded, "Yes, Jim. You regularly make us aware of this. Hopefully you won't have to ask any more in the next year." *Id.* ¶ 175.

During both of the June 2022 conversations with management Trotter expressly accused the NFL of discrimination, and during the second conversation Trotter directly attributed the lack of diversity at NFL Media to a pattern of "discriminatory conduct." While the description of these remarks is, admittedly, somewhat vague, at the pleading stage "[p]laintiff need not provide the precise language [he] used when making [his] complaints." *Moore*, 2024 WL 989843, at *13 (internal quotation marks omitted). Further, while Trotter's January 2023 complaint did not expressly reference discrimination, Smith's response makes clear that NFL's leadership was fully aware of the nature of the complaints Trotter was raising.

The June 2022 complaints likely constitute protected activity in their own right. But more than that, these other remarks color how the NFL would reasonably have understood Trotter's remarks to Goodell by making clear that Trotter believed the lack of diversity at the NFL was not merely the product of insufficient efforts at affirmative action, but rather the result of discrimination. When the complaint is read as a whole, and drawing all reasonable inferences in plaintiff's favor, plaintiff has plausibly alleged that defendants

were aware Trotter was complaining about conduct he believed to be unlawful when Trotter made his comments to Goodell. *See, e.g.*, *Osorio v. Source Enterprises, Inc.*, 2007 WL 683985, at *4-5 (S.D.N.Y. Mar. 2, 2007) (relying on prior conversations with employer "that effectively fleshed out the more general statements in [plaintiff's] complaint" to conclude employer was on notice employee was complaining about discrimination).

*Third*, defendants nonetheless insist Trotter's complaints were too vague to constitute protected activity because they did not identify "a particular unlawful employment practice or a specific individual subject to unlawful discrimination." Defs. Reply (Dkt. 29) at 1. Indeed, when asked at oral argument why the NFL believed Trotter's two complaints in June 2022 were not protected activity, counsel for the NFL claimed they were deficient because Trotter "doesn't go farther and specifically note a specific unlawful employment practice," which the NFL argues is required to put an employer on notice. Argument Tr. (Dkt. 31) at 9.[7] Despite the competent advocacy of NFL's counsel, the Court finds that this is a vast overreading of Second Circuit law.

_____

[7]    Counsel for the NFL's only other response to the June 2022 complaints was that they lack the requisite temporal proximity to the adverse employment action. *See* Argument Tr. (Dkt. 31) at 7. As explained in the next Section, the Court disagrees, both because other circumstantial evidence beyond temporal proximity exists to establish causation and because these June 2022 statements shape how the NFL should have understood the subsequent February 2023 statements that occurred approximately a month before Trotter's termination.

For a complaint to qualify as protected activity, "an employee is not required to mention discrimination or use particular language." *Moore*, 2024 WL 989843, at *13 (internal quotation marks omitted); *see MacAlister v. Millenium Hotels & Resorts*, 2018 WL 5886440, at *9 (S.D.N.Y. Nov. 8, 2018) (same). As guidance from the Equal Employment Opportunity Commission ("EEOC") explains, "[i]ndividuals may make broad or ambiguous complaints of unfair treatment, in some instances because they may not know the specific requirements of the anti-discrimination laws. Such communication is protected opposition if the complaint would reasonably have been interpreted as opposition to employment discrimination." EEOC, Enforcement Guidance on Retaliation and Related Issues, 2016 WL 4688886, at *8 (Aug. 25, 2016).[8] To qualify as protected activity, there is no requirement a complaint identify a particular individual who was discriminated against or the particular policy they are challenging. Rather, all that is necessary is that the employee have a reasonable, good faith belief the employer is engaged in conduct prohibited by the anti-discrimination laws, and then convey that belief to the employer in a manner that can reasonably be understood as such.

---

[8]    The Supreme Court has held it is proper for courts to look to the prior EEOC Compliance Manual -- which the cited guidance document replaced -- when construing the scope of Title VII's retaliation provision. *See Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (suggesting EEOC manual provides "a body of experience and informed judgment to which courts and litigants may properly resort for guidance"); *Crawford*, 555 U.S. at 276 (same).

None of the cases cited by defendants is to the contrary. It is true that an employee's opposition must be "directed at an unlawful *employment practice* of his employer." *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999). But the cases defendants cite that found this requirement not to be satisfied did so because the practice clearly could not have been unlawful -- as where an employee simply complains an employer should pursue greater affirmative action[9] -- or was not a practice attributable to the employer at all.[10] Defendants cite several other cases for the proposition that "general or ambiguous references to 'race discrimination' are not sufficient to support a retaliation claim." MTD (Dkt. 27) at 13. Remove the word "race" from this sentence, and it would approach an accurate statement of the law. The cases defendants cite for this proposition found that accusations of "discrimination" were insufficient, but only because the plaintiff failed to allege the discrimination was based on any

---

[9]    *See Manoharan*, 842 F.2d at 594 (concluding "complaints . . . that [defendant] was not pursuing affirmative action goals in [its] selection process" were not protected activity because "Title VII states that affirmative action in employment practices is not required by Title VII"); *Moazzaz*, 2021 WL 827648, at *13 ("[A] lack of diversity alone is not actionable, and anti-discrimination laws do not require employers to maintain diversity programs." (internal quotation marks omitted)); *Byerly v. Ithaca Coll.*, 290 F. Supp. 2d 301, 309 (N.D.N.Y. 2003) (concluding that "advocat[ing] for the hiring of two minority candidates" did not constitute protected activity), *aff'd*, 113 F. App'x 418 (2d Cir. 2004).

[10]    *See Wimmer*, 176 F.3d at 134-35 (concluding plaintiff's complaints about co-workers discriminatory conducted directed "towards the public" were insufficient where there was "no evidence . . . that there was unlawful discrimination with respect to the terms and conditions of employment" at the defendant-employer).

protected characteristic (e.g. race, color, religion, sex, or national origin).[11]

In short, the cases defendants cite involved circumstances where "the challenged conduct was clearly not covered by Title VII." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 783 n.11 (S.D.N.Y. 2019) (distinguishing *Kelly*, *Wimmer* and *Manoharan* on this ground). None of defendants' cases found an employee's complaint of race discrimination not to be protected activity simply because the employee failed to specify the exact policy, practice or decision they were challenging. Accordingly, the Court finds plaintiff has adequately alleged his complaints from February 2022 to February 2023

---

[11]    *See Kelly*, 716 F.3d at 15 (concluding complaints to employer that "repeatedly used the words 'discrimination' and 'harassment'" were not protected activity because "nothing in [plaintiff's] complaint . . . indicate[d] that her sex, in one way or another, played a substantial role" in the challenged behavior); *Wilson v. New York & Presbyterian Hosp.*, 2021 WL 9493971, at *12 (E.D.N.Y. June 22, 2021) ("[Plaintiff] made multiple complaints to Human Resources regarding 'harassment' he experienced at the hands of Pine and Aldea, including that he was 'set up to fail,' but these complaints did not identify this harassment as related to his membership in a protected class."); *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 102-03, 108 (2d Cir. 2011) (holding "generalized" complaints were insufficient where none "contained an allegation that [plaintiff] had complained specifically of sexual harassment"). The Second Circuit's Summary Order in *Bamba v. Fenton*, 758 F. App'x 8, 13 (2d Cir. 2018), does not describe the actual language of the plaintiff's complaint to her employer; however the district court's opinion (which was affirmed) explained that while the complaint "contains the word 'discrimination,'" it "does not contain any allegations indicating that the complained of 'discrimination' was based on race, color, religion, sex, or national origin." *Bamba v. Fenton*, 2017 WL 3446806, at *8 (E.D.N.Y. Aug. 10, 2017).

constitute protected activity of which defendants were aware, satisfying the first two elements of his retaliation claim.[12]

      2. Elements Three & Four – Adverse Action & Causal

         Connection

---

[12] Trotter argues that his complaint identifies two other categories of protected activity. As explained below, in light of the Court's findings that Trotter has sufficiently identified other instances of protected activity, the Court need not resolve whether these other allegations might be sufficient standing alone.

    *First*, Trotter argues that his complaints about racist comments by team owners Pegula and Jones constitute protected activity. Defendants respond that these do not constitute protected activity because (i) Pegula and Jones were not plaintiff's employer, and (ii) because complaints about stray remarks such as these cannot constitute protected activity as a matter of law. Defs. Mot. (Dkt. 27) at 13-14. The parties briefing on the former argument is insufficient to resolve the question, and the Court is skeptical whether the latter argument is an accurate statement of the law. *See* EEOC, Enforcement Guidance on Retaliation and Related Issues, 2016 WL 4688886, at *10 (Aug. 25, 2016) (forcefully arguing that "even reporting an isolated single incident of harassment" can constituted protected activity); *La Grande*, 370 F. App'x at 212 (reversing dismissal of retaliation claims based on complaints about two race-based remarks made more than seven months apart and complaints about sexual harassment incident of a female customer). However, the Court does not need to resolve this dispute because even if the complaints were protected activity, they occurred well over a year before Trotter was terminated, and so do not support an inference of causation.

    *Second*, Trotter argues that that his complaints about retaliation in March 2023 constitute protected activity. *See* Compl. ¶ 209; Pls. Opp. (Dkt. 28) at 10. In response, defendants argue that "only 'complaints of retaliation for protected activity' qualify as protected activity." Defs. Reply (Dkt. 29) at 5 (quoting *Flynn v. N.Y. State Div. of Parole*, 620 F. Supp. 2d 463, 489 (S.D.N.Y. 2009). The single case defendants cite does not directly support this proposition -- *Flynn* found the complaints of retaliation *were* protected activity, without the "only" caveat inserted by defendants, *see* 620 F. Supp. at 489-90 -- but plaintiff cites no case to the contrary, and this proposition seems intuitively correct. Regardless, the Court need not resolve this dispute because it finds Trotter has alleged that he engaged in protected activity prior to this email.

To satisfy the remaining elements of his retaliation claim, plaintiff must adequately allege that as a result of his complaints, he was subjected to an adverse retaliatory action by the defendants. Here it is undisputed that plaintiff was subjected to an adverse action: he was terminated. But this still leaves the issue of whether such termination was in retaliation for his complaints.

Plaintiff may "establish a causal connection to support [his] retaliation claim either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . ; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Colon v. N.Y.C. Hous. Auth.*, 2021 WL 2159758, at *13 (S.D.N.Y. May 26, 2021) (internal quotation marks omitted). At the pleading stage, close temporal proximity, even standing alone, can be sufficient to establish the requisite causal connection. *See Witcher v. N.Y.C. Dep't of Educ.*, 2023 WL 2609342, at *14 (S.D.N.Y. Mar. 23, 2023) ("Although temporal proximity alone will not be enough to support [plaintiff's] claim on summary judgment, it is sufficient at the pleading stage.") (internal quotation marks omitted); *Huda v. N.Y.C. Health & Hosps. Corp.,* 2021 WL 1163975, at *8 (S.D.N.Y. Mar. 26, 2021) (similar).

The Second Circuit "has not drawn a bright line defining, for the purposes of a *prima facie* case, the outer limits beyond which a temporal relationship is too attenuated to establish causation," but it has "previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93,

110 (2d Cir. 2010). Further, "[w]here temporal proximity is not the only evidence that bears on a causal connection, [the Second Circuit] ha[s] recognized that the lapse in time between the protected activity and adverse action can be longer." *Banks v. Gen. Motors*, LLC, 81 F.4th 242, 277–78 (2d Cir. 2023).

Here, Trotter was informed on March 24, 2023, that his contract was not being renewed. Compl. (Dkt. 1) ¶ 211. This occurred less than two months after the February 2023 press conference during which Trotter questioned Goodell about the lack of diversity at NFL Media, well within the time period short enough to support a causal inference. *See id.* ¶¶ 186-87. What is more, in November 2022 Trotter's agent had been informed by Sandra Nunez, NFL Vice President of On-Air Talent Management, that she anticipated Trotter's contract would be renewed and his role might even be expanded, but then the NFL did an abrupt about-face shortly after Trotter's February 2023 remarks. *Id.* ¶¶ 178-180. Furthermore, before informing Trotter of this change, Nunez confronted him on March 2, 2023, to ask whether Trotter was "in alignment" with the NFL newsroom. *Id.* ¶ 197. Viewed in the light most favorable to plaintiff, during this conversation Nunez was seeking to gauge whether Trotter was willing to abandon his advocacy of the race-related issues voiced during the February 2023 press conference and, when Trotter responded that he was not willing to do so, the NFL ultimately made the decision not to extend his contract (i.e., retaliated against him). Causation is thus supported by both temporal proximity and allegations that directly suggest a retaliatory animus.

Defendants acknowledge that temporal proximity alone can be sufficient to establish causation at the pleading stage in some circumstances, but nonetheless argue temporal proximity is insufficient here. *See* Defs. Mot. (Dkt. 27) at 15-16. Defendants point out that plaintiff had been complaining about the lack of diversity at NFL Media since at least February 2022, and yet suffered no adverse action until March 2023, and so the earlier "complaint[s] 'actually undermine[] the inference' that the adverse employment action was taken 'for discriminatory reasons.'" Defs. Reply (Dkt. 29) at 6 (quoting *Powell v. Merrick Acad. Charter Sch.*, 2018 WL 1135551, at *7 (E.D.N.Y. Feb. 28, 2018)).[13]

Plaintiff offers at least two plausible responses to this argument. First, plaintiff points out that his contract with the NFL was not up for renewal until March 2023 (it had been renewed for a three-year term in March 2020), so it is not surprising that there was no adverse action to end his employment before then. *See* Compl. ¶¶ 94-95. Second, plaintiff suggests that, as he continued to press his complaints against the NFL, defendants gradually lost patience with

---

[13]   The only case cited by defendants to support this proposition, *Powell v. Merrick Acad. Charter Sch.*, is factually distinguishable. In that case, the allegations that "undermined the inference" of retaliation offered "an obvious alternative explanation for [plaintiff's] termination" (i.e., "that she was unable to get along with her coworkers, and in particular with Johnson, whom the Board promoted to principal in May 2013"). 2018 WL 1135551, at *7. That case also rested its holding that there was no causation on the "more important[]" fact that the adverse employment actions had begun "before [plaintiff] disclosed her disability," which undermined any inference that her disclosing the disability caused her termination. *Id.*

him, and the February 2023 remarks to Goodell were the final straw that led them to reconsider any decision they may have made to keep him on. *See* Pls. Opp. (Dkt. 28) at 17.

Plaintiff's allegations are sufficient, at least at the pleading stage, to allege a causal connection between his protected activity and the adverse employment action. While a trier of fact could rely on defendants' argument to conclude there was no retaliatory animus, the alternative inferences put forward by plaintiff are at least equally plausible. These were complaints publicly criticizing the Commissioner of the NFL to his face, accusing him of failing to live up to his promise to address race discrimination (or at least a lack of diversity) in the NFL. It is easy to imagine how this remark could have tipped the scales and led to Trotter's ultimate termination.

**B. Section 1981 Hostile Work Environment Claim.**

Defendants next seek dismissal of plaintiff's hostile work environment claim.[14] To state such a claim, plaintiff must allege facts that show the challenged conduct "(1) is objectively severe or pervasive -- that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates

---

[14]   In their opening brief, defendants also argued plaintiff had failed to allege a race discrimination claim. *See* Defs. Mot. (Dkt. 27) at 18-20. However, plaintiff's opposition brief concedes that he is not asserting a claim for race discrimination and is instead only asserting claims for retaliation and a hostile work environment. *See* Pls. Opp. (Dkt. 28) at 18 n.10.

such an environment because of the plaintiff's race." *Sykes v. Rachmutch*, 2023 WL 2752865, at *7 (S.D.N.Y. Mar. 31, 2023) (internal quotation marks omitted). "[A] plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21 (internal quotation marks omitted).

Here, to support his hostile work environment claim, plaintiff relies on (1) certain racist remarks allegedly made by NFL team owners Pegula and Jones, (2) the subsequent directives to Trotter not to report on those remarks, (3) the NFL's "failure to hire and promote black employees" generally, and (4) "repeated failures by the NFL to take action in response to complaints of racial discrimination by Mr. Trotter." Pls. Opp. (Dkt. 28) at 18-19. These allegations are nowhere near sufficient to state a hostile work environment claim.

The first and second allegations, standing alone, do not remotely support a hostile work environment claim. Plaintiff was not present at the time Pegula made the alleged statements, and the remark by Jones was a one-off comment that was prompted by plaintiff's own probing. Even assuming these remarks by NFL team owners are attributable to the NFL, such stray comments alone do not create a sufficiently pervasive hostile environment, by themselves, to state a hostile work environment claim. *See Littlejohn*, 795 F.3d at 321 ("The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed

pervasive."); *Kemp v. A & J Produce Corp.*, 164 F. App'x 12, 14 (2d Cir. 2005) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997))); *La Grande*, 370 F. App'x at 212.

Likewise, the third and fourth allegations do not meaningfully support plaintiff's claim. As an initial matter, a lack of diversity at an organization by itself is not sufficient to create a hostile work environment. And while plaintiff may have reasonably believed the lack of diversity was the product of discriminatory hiring practices, his complaint does not allege that he himself was subjected to such discriminatory practices or, for that matter, identify any other specific individual who was. Similarly, with respect to the fourth allegation, complaints about discrimination against others may well constitute protected activity, but failure to remedy such issues in no way subjected Trotter himself to a hostile work environment. Even setting this aside, a "failure to investigate [plaintiff's] complaint[s] could not itself have contributed to or constituted a hostile work environment." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010). Accordingly, the Court granted defendant's motion to dismiss this claim. Further, because the claim is so clearly deficient, and because plaintiff's counsel was unable

to identify at oral argument facts that might remedy this deficiency, the Order of May 29, 2024 dismissed this claim with prejudice.

**C. NYSHRL / NYCHRL Claims.**

Finally, defendants seek dismissal of plaintiff's NYSHRL and NYCHRL claims. Defendants argue, among other things, that these claims fail because plaintiff has failed to allege the requisite impact in New York. Because the Court agrees, it does not reach defendants other, substantive challenges to these claims.

For a non-resident of New York, such as plaintiff, to bring a claim under either the NYSHRL or NYCHRL, the non-resident "must plead and prove that the alleged discriminatory conduct had an impact in New York" State (as to the NYSHRL) or New York City (as to the NYCHRL). *Hoffman v. Parade Publs.*, 15 N.Y.3d 285, 291 (2010). In *Hoffmann v. Parade Publs.*, the New York Court of Appeals applied this standard to conclude that dismissal of the plaintiff's NYSHRL and NYCHRL claims was proper even though the defendant-company was headquartered in New York, the decision to terminate the plaintiff was made in New York, all management decisions were made from New York, and the plaintiff attended quarterly meetings in New York. *See id.* at 289-92. These connections to New York were insufficient, the Court found, in the absence of any allegation that the plaintiff was subjected to discrimination while working in the state or city.

Here, the complaint's allegations are essentially indistinguishable from those found lacking in *Hoffman*. Plaintiff is a California resident who worked for the NFL in its California office.

Compl. ¶ 18. To try to satisfy the impact requirement, the complaint alleges that (1) "the NFL league office is located in New York City," (2) "decisions related to Mr. Trotter's employment and termination were made in New York City," and (3) "Mr. Trotter worked in New York City and stayed overnight in New York City during his employment for the NFL." *Id.* ¶ 233. The complaint does not identify any discriminatory conduct that occurred while Trotter was in New York. Indeed, the complaint does not even describe any specific trips Trotter took to New York, and so in that respect the complaint's allegations are weaker than those in *Hoffman*, where the plaintiff allegedly attended quarterly meetings here.

Although alleged nowhere in the complaint, plaintiff also claims that his "employment contract states that his employment was at all times governed by New York law and any disputes would be resolved in New York courts." Pls. Opp. (Dkt. 28) at 20. This is the only fact that even arguably distinguishes *Hoffman*. However, the Court finds it is insufficient to change the outcome for two reasons.

*First*, by its terms, the choice-of-law clause does not encompass plaintiff's employment claims. The clause provides as follows:

> This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely therein.

Court Exhibit 1 (Dkt. 30) ¶ 19. Had the clause simply said "[t]his Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of New York," plaintiff might have

a point, but the further phrase, "applicable to contracts entered into and performed entirely therein," makes clear that the choice-of-law clause applies only to matters relating to contract, but does not extend to matters such as tort or employment discrimination. At oral argument, plaintiff's counsel suggested that the phrase "contracts entered into and performed entirely therein" somehow suggests that "the parties are agreeing that New York law will apply as if Mr. Trotter's entire employment was performed in New York." Argument Tr. (Dkt. 31) at 52. But this ignores the critical portion of the phrase "applicable to contracts," which specifies the choice-of-law clause encompasses contract issues, not the law of employment discrimination.

At the invitation of the Court, Trotter submitted additional citations that he believes support his argument. Those cases stand for the proposition a choice-of-law provision selecting New York law will be enforced so long as "the litigation has a 'reasonable relationship' to New York," *McPhee v. Gen. Elec. Int'l, Inc.*, 736 F. Supp. 2d 676, 681 (S.D.N.Y. 2010), *aff'd*, 426 F. App'x 33 (2d Cir. 2011), and that a contractual choice-of-law provision can apply to related tort claims "if the provision is sufficiently broad so as to encompass the entire relationship between the contracting parties," *Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 256 n.5 (S.D.N.Y. 2020) (internal quotation marks omitted). *See Aramarine Brokerage, Inc. v. OneBeacon Ins. Co.*, 307 F. App'x 562, 564 (2d Cir. 2009); *Williams v. Deutsche Bank Sec., Inc.*, 2005 WL 1414435, at *4-5 (S.D.N.Y. June 13, 2005);

*Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309 (2d Cir. 1994).

Only one of those cases, *Turtur v. Rothschild Registry Int'l, Inc.*, considered a choice-of-law provision remotely similar to that at issue here. In that case, the Second Circuit found that the following choice-of-law provision applied to common law fraud claims relating to the underlying contract:

> [t]his note shall be governed by, and interpreted under, the laws of the State of New York applicable to contracts made and to be performed therein without giving effect to the principles of conflict of laws. The parties hereto consent to the exclusive jurisdiction of the courts of the State of New York to resolve any controversy or claim *arising out of or relating to* this contract or breach thereof.

*Turtur*, 26 F.3d at 309 (emphasis in original). While this provision does contain the phrase "applicable to contracts," similar to the provision at issue here, the Second Circuit's decision did not rely on that portion of the clause in reaching its conclusion, but instead relied exclusively on the later reference to "claim arising out of or relating to" the contract. *Id.* at 309-10 (concluding plaintiff's fraud claims "clearly 'arise out of' or 'relates to' their investment). Accordingly, this case plainly is distinguishable from the instant motion.

*Second*, even assuming the choice-of-law provision applied to tort claims, it does not follow that the provision is sufficient to satisfy the impact requirement such that the NYCHRL or NYSHRL are applicable. In announcing the impact requirement, *Hoffman* did not simply set forth a choice-of-law principle that may be waived through agreement of the

parties. Rather, *Hoffman* observed that the purpose of the NYSHRL and the NYCHRL is to protect "those who work in New York" State and New York City, respectively, and adopted the impact requirement so as to conform the scope of each statute to this substantive goal. 15 N.Y.3d at 291; *see Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 183 (2d Cir. 2016) ("Under the NYCHRL the impact of the employment action must be felt *by the plaintiff* in NYC."). The impact requirement is thus a substantive limitation on the geographic reach of the respective statutes. A choice-of-law analysis is unnecessary, and the choice-of-law provision is largely irrelevant, because insofar as the impact requirement is not satisfied neither statute applies. *See* Restatement (Second) of Conflict of Laws § 6 cmt. b (A "court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect. . . . [I]f the legislature intended that the statute should be applied only to acts taking place within the state, the statute should not be given a wider range of application.").

It may be noted that this is analogous to the presumption against extraterritoriality. Under that doctrine, courts presume "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) (internal quotation marks omitted). Because that doctrine limits the substantive scope of the law (albeit by way of implication), whether the presumption applies does not depend on a choice-of-law

analysis or whether the statute in question will conflict with other foreign law. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 174 (1993) ("[T]he presumption [against extraterritoriality] has a foundation broader than the desire to avoid conflict with the laws of other nations.") (internal quotation marks omitted); *see also Morrison*, 561 U.S. at 254 ("[T]o ask what conduct [the statute] reaches [extraterritorially] is to ask what conduct [the statute] prohibits, which is a merits question.").

Plaintiff cites no case finding the impact requirement was satisfied by a choice-of-law provision, whereas defendants identify several cases that have found similar choice-of-law provisions in a severance agreement and a non-solicitation agreement to be insufficient to satisfy the impact test. *See Pedroza v. Ralph Lauren Corp.*, 2020 WL 4273988, at *5 (S.D.N.Y. July 24, 2020) (finding choice-of-law provision selecting New York law was insufficient to distinguish facts that were otherwise similar to those in *Hoffman*); *Rinaldi v. Nice, Ltd.*, 2021 WL 827767, at *9 (S.D.N.Y. Mar. 4, 2021) (similar regarding New York choice-of-law provision in non-solicitation and confidentiality agreement). Plaintiff suggests these cases are distinguishable because they did not involve employment agreements, but the Court fails to see how this distinction is material in light of the reasoning set forth above.

Finally, plaintiff suggests that the Court should defer application of the impact requirement because any such "analyses are typically conducted at summary judgment." Pls. Opp. (Dkt. 28) at 20.

But, by design, the impact requirement does not require a "fact-intensive analysis of the amount of contact" with New York. *Fried v. LVI Servs., Inc.*, 2011 WL 4633985, at *13 (S.D.N.Y. Oct. 4, 2011), *aff'd*, 500 F. App'x 39 (2d Cir. 2012). Rather, the requirement is intended "to be simple to follow and predictable in its application." *Id.* That "goal would be completely undermined if courts were required to conduct a fact-intensive analysis of the amount of contact a particular individual maintained with New York City even where it was undisputed that that individual did not work in New York City." *Id.* Since the impact of an unlawful practice on plaintiff is the kind of information generally within a plaintiff's control prior to filing, and plaintiff has failed to offer any allegations that would suggest such impact occurred here, the Court sees no reason to defer ruling.

For the reasons set forth above, the Court by Order dated May 29, 2024 granted defendants' motion to dismiss plaintiff's hostile work environment, NYCHRL and NYSHRL claims, but denied defendants' motion to dismiss plaintiff's Section 1981 retaliation claim. The case will therefore go forward with respect to the latter claim alone.

New York, NY
June 11, 2024

JED S. RAKOFF, U.S.D.J.